[Civ. No. 24150. First Dist., Div. One. June 30, 1969.]

RICHARD C. GRINNELL, Plaintiff and Respondent, v. CHARLES PFIZER & COMPANY, INC., Defendant and Appellant.

CARLOS BENEDETTI, Plaintiff and Respondent, v. CHARLES PFIZER & COMPANY, INC., Defendant and Appellant.

(Consolidated Cases.)

Barfield, Barfield & Dryden, Barfield, Barfield, Dryden & Ruane and Cyril Viadro for Defendant and Appellant.

Hoberg, Finger, Brown & Abramson, Boccardo, Blum, Lull, Niland, Teerlink & Bell, Edward J. Niland and Stanley A. Ibler, Jr., for Plaintiffs and Respondents.

MOLINARI, P. J.—Defendant appeals from judgments on jury verdicts awarding plaintiff Grinnell $60,000 damages and plaintiff Benedetti $80,000 damages for injuries sustained from ingesting Sabin oral polio vaccine, Type I, furnished by defendant manufacturer. Defendant also appeals from the orders denying its motion for judgments notwithstanding the verdicts.

### The Facts

In May of 1962 six San Francisco Bay area medical societies (hereinafter referred to as "BAMAC")[1] joined together to coordinate and publicize an areawide polio immunization program and contracted with L. C. Cole & Company to carry out the necessary organizational and promotional efforts. The date for immunization throughout the Bay area under the so-called "KO Polio" campaign was September 23, 1962, and the first news releases on the program went out in late July and the intensity of the publicity increased as the target date neared. In June 1962 defendant made a quotation to BAMAC for furnishing the vaccine and ultimately sold the needed doses to BAMAC. Plaintiff Grinnell participated in the "KO Polio" program and received Type I oral polio vaccine. At that time he was 58 years of age. Plaintiff Benedetti also received the vaccine on September 23, 1962, at which time he was 33 years of age. Shortly thereafter plaintiff Grinnell contracted Type I polio which left him with a partially paralyzed and weakened left arm. Plaintiff Benedetti also became ill with Type I polio. Other facts are set out below where pertinent to the discussion.

### Procedural Background

Originally each plaintiff brought his separate action for personal injuries on the theories of negligence, breach of implied warranty and breach of express warranty. The com-

[1]The medical societies of Alameda, Contra Costa, Marin, San Francisco, Santa Clara and San Mateo Counties were involved in the program. They formed an organization known as the Bay Area Medical Association Committee to carry out the campaign.

plaints were subsequently amended to include a cause of action based on strict liability in tort, and the cases were consolidated for trial. At the close of the trial, the judge determined that he would not instruct on the theory of strict liability apparently because the evidence did not establish a "defect" in the polio vaccine. However, he concluded that the case should be submitted only on the theories of express warranty and implied sales warranty and the jury was so instructed. The jury returned verdicts for both plaintiffs and the court subsequently denied defendant's motion for judgments notwithstanding the verdicts.

## Contentions

The major contentions of defendant are that plaintiffs failed to prove that their respective illnesses were vaccine induced and that they also failed to prove the breach of either an implied or express warranty.[2]

## The Theory of Strict Liability

■ Before proceeding to the merits of defendant's arguments, we first observe that in cases involving personal injuries resulting from defective products, the theory of strict liability in tort has virtually superseded the concept of implied warranties. (*Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) ■ As we pointed out in *Alvarez* v. *Felker Mfg. Co.,* 230 Cal.App.2d 987, 1005 [41 Cal.Rptr. 514]: "The nature of the strict liability of a manufacturer resulting from the sale of defective products was finally put to rest by *Greenman* which declared that such liability is not one governed by the law of contract warranties or the implied warranties of the sales act, but by the law of strict liability in tort, and that the rules defining and governing warranties 'cannot properly be invoked to govern the manufacturer's liability to those injured by its defective products unless those rules also serve the purposes for which such liability is imposed.'" ■ In the light of this rule we believe that if the trial court was justified in submitting the case to the jury

[2] In its opening brief defendant seems to argue that neither plaintiff ever *had* polio regardless of its cause. This argument was apparently abandoned in the closing brief and was not urged at oral argument. Accordingly, we deem the argument abandoned and observe, moreover, that there is substantial evidence in the record to establish that both plaintiffs had contracted polio Type I and that they were suffering from its effects.

on the basis of implied warranty liability, it also had cause to instruct on the law of strict liability in tort. ■ The fact that no instruction was given by the trial court on the law of strict liability in tort does not preclude reliance on that theory since the basic elements to be proved are the same. (See *Greenman* v. *Yuba Power Products, Inc., supra,* at p. 62; *Davis* v. *Wyeth Laboratories, Inc.,* 399 F.2d 121, 126; Prosser, *The Fall of the Citadel (Strict Liability to the Consumer),* 50 Minn.L.Rev. (1966) 791, 804-805; cf. *Rose* v. *Melody Lane,* 39 Cal.2d 481, 488 [247 P.2d 335].)[3] ■ Although the trial court instructed in terms of the implied warranty of fitness for the purpose for which the vaccine was sold provided for in former Civil Code section 1735,[4] which was in force at the time the subject vaccine was ingested, the effect of these instructions was to instruct on the theory of strict liability in tort since "The section imposes an absolute liability regardless of negligence." (*Vaccarezza* v. *Sanguinetti,* 71 Cal.App. 2d 687, 689 [163 P.2d 470]; and see *Greenman* v. *Yuba Power Products, Inc., supra.*)[5] Accordingly, in the discussion that follows we will deal with the rules involving strict liability in tort rather than the superseded implied warranty concept.

■ In view of the foregoing, we observe that it is clearly the law in California that the theory of strict liability in tort is available in cases where the vaccinated individual contracts the disease the vaccine was designed to protect against. In the only other California polio vaccine case which has come to our attention liability was predicated upon the breach of the implied warranty of fitness and merchantability when defective Salk polio vaccine was administered to the plaintiffs and caused them to contract polio. (See *Gottsdanker* v. *Cutter Laboratories* (1960) 182 Cal.App.2d 602 [6 Cal.Rptr. 320, 79

---

[3]In *Greeno* v. *Clark Equipment Co.* (N.D. Ind. 1965) 237 F.Supp. 427, 429, the court noted that the doctrine of strict liability is "hardly more than what exists under implied warranty when stripped of the contract doctrines of privity, disclaimer, requirements of notice of defect, and limitation through inconsistencies with express warranties."

[4]Civil Code section 1735 was repealed effective January 1, 1965 and its provisions have been substantially incorporated in sections 2314, 2315 and 2317 of the Uniform Commercial Code.

[5]The trial court instructed in the terms of implied warranties as defined in former Civil Code section 1735 and generally on the application of implied warranty liability, and particularly instructed that in order to find a breach of implied warranty plaintiffs must have proved that the vaccine contained a harmful ingredient. As will be apparent from the discussion that follows, the presence of such an ingredient is tantamount to the presence of the "defect" inherent in the strict liability in tort doctrine.

A.L.R.2d 290].) However, in *Greenman* the *Gottsdanker* case was cited with approval as an example of the extension of the doctrine of strict liability. (At p. 62.) We note, moreover, that the doctrine of strict liability in tort has been applied to a vendor of prescription drugs. (*Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 710-711 [60 Cal.Rptr. 398].)

■ We, therefore, advert to the rule of strict liability which is stated thusly in *Greenman*: "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (59 Cal.2d at p. 62.) In applying the rule to the instant case, we note, initially, that it is undisputed that the subject vaccine was placed on the market by defendant with knowledge that persons who ingested it would use it without inspection for defects. Accordingly, our inquiry is directed to whether it was proved that the vaccine was defective and, if so, whether the defect caused injury to plaintiffs. In this regard, we here point out that the instant case was litigated in such a manner that the evidence adduced on the issues of defectiveness and causation was practically inseparable. Accordingly, some of the same evidence was adduced by plaintiffs to prove, and by defendant to disprove, defectiveness and causation.

## Defectiveness and Causation

■ Defendant argues, in the contest of implied sales warranty, that there was no breach because the product was non-defective and was reasonably fit for the purpose intended. Defendant contends, further, that plaintiffs have not sustained their burden of proving the actual cause of their injury. The latter argument is particularly grounded on the fact that recognized experts in the field testified at the trial that there is no definite way to establish that any individual case of polio was induced by vaccine. In considering these arguments we note, initially, that there is no direct evidence of any impurity or dangerous virulence in the vaccine ingested by plaintiffs.[6] We also note that it is undisputed that polio is caused by a virulent virus; that if a person has polio it is caused either by a wild-virus strain or by a vaccine-

---

[6] In this regard the present case differs from *Gottsdanker* v. *Cutter Laboratories, supra,* 182 Cal.App.2d 602, where there was evidence of live virus in a dead virus vaccine.

induced strain; and that if the vaccine is produced as it should be it must be free of virulent particles, that is, all of the particles should be attenuated or non-virulent. Accordingly, it is apparent that if the vaccine did cause plaintiffs' illnesses, the inference is warranted that the vaccine did contain virulent particles, and, therefore, that it was defective.

 The burden of proof is on the plaintiffs to prove that the vaccine was defective and that the defect caused their injuries. (*Gherna* v. *Ford Motor Co.*, 246 Cal.App.2d 639, 650 [55 Cal.Rptr. 94]; *Erickson* v. *Sears, Roebuck & Co.*, 240 Cal.App.2d 793, 798 [50 Cal.Rptr. 143].) They were not, however, required to prove their case beyond a reasonable doubt, but were only required to introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of defendant was a substantial factor in bringing about the polio suffered by plaintiffs. (Prosser on Torts (3d ed. 1964) p. 245; *Lysick* v. *Walcom*, 258 Cal. App.2d 136, 153 [65 Cal.Rptr. 406]; *Vandermark* v. *Ford Motor Co.*, 61 Cal.2d 256, 261 [37 Cal.Rptr. 896, 391 P.2d 168].) As stated by Prosser, "He [the plaintiff] need not negative entirely the possibility that the defendant's conduct was not a cause, and it is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not." (Prosser on Torts (3d ed. 1964) p. 246.) Accordingly, a plaintiff is entitled to rely on circumstantial evidence to establish the existence of a defect and that the defect caused the injury. (*Vandermark* v. *Ford Motor Co.*, *supra*, at p. 260; *Casetta* v. *United States Rubber Co.*, 260 Cal.App.2d 792, 809 [67 Cal.Rptr. 645]; *Gherna* v. *Ford Motor Co.*, *supra*, at p. 650; *Erickson* v. *Sears, Roebuck & Co.*, *supra*, at pp. 798-799.) Such evidence may be established by expert testimony. (*Vandermark* v. *Ford Motor Co.*, *supra*, at pp. 259-260; *Greenman* v. *Yuba Power Products Inc.*, *supra*, 59 Cal.2d 57, 60; *Casetta* v. *United States Rubber Co.*, *supra*, at p. 808; *Reynolds* v. *National Gas Equipment, Inc.*, 184 Cal.App.2d 724, 737 [7 Cal.Rptr. 879]; see *People* v. *Goldstein*, 139 Cal.App.2d 146, 153-154 [293 P.2d 495].)[7]

---

[7]It should be here noted that in California a product may be deemed defective for the purposes of the doctrine of strict liability in tort, although faultlessly made, if it is unreasonably dangerous to place the product in the hands of the user without a suitable warning and the product is supplied and no warning is given. (*Canifax* v. *Hercules Powder Co.*, 237 Cal.App.2d 44, 52-55 [46 Cal.Rptr. 552]; *Gherna* v. *Ford Motor Co.*, *supra*, 246 Cal.App.2d 639, 651; *Toole* v. *Richardson-Merrell Inc.*,

 Adverting to the evidence adduced in the instant case in the light of the foregoing principles, we observe that in 1962 a special advisory committee was appointed by the Surgeon General to investigate cases of paralytic diseases occurring after oral vaccine. Dr. Alexander D. Langmuir, a member of this committee and Chief of the Epidemiology Branch of the United States Communicable Disease Center, testified that in his judgment some California 1962 cases which followed administration of Type I vaccine were vaccine induced, but agreed with the conclusion of the special committee that it was impossible to prove that any individual case was caused by vaccine. Both Dr. Langmuir and the special committee report indicated that no laboratory test could provide a definitive answer. Three other medical witnesses for defendant testified to the same effect. It is on the basis of this testimony that defendant argues that it was impossible to prove that plaintiffs' illnesses were caused by defendant's vaccine.

The foregoing testimony, however, does not preclude a finding by the jury that the polio contracted by plaintiffs was vaccine induced when it is considered in connection with other evidence which is favorable to plaintiffs. That evidence shows that both plaintiffs were in the group studied by the special advisory committee and both were ascertained to be in the "compatible" group—that is, compatible with the possibility of vaccine-induced illness. Compatibility was widely discussed and variously defined by the numerous medical experts testifying at this trial. By one definition, if a case was compatible, the possibility of causation by the vaccine could not be ruled out. Cases were judged compatible when three

*supra,* 251 Cal.App.2d 689, 710-711; *Barth* v. *B. F. Goodrich Tire Co.,* 265 Cal.App.2d 228, 244-245 [71 Cal.Rptr. 306]; see also *Davis* v. *Wyeth Laboratories, Inc.,* 399 F.2d 121, 128-130; Rest. 2d Torts, § 402A, coms. j and k; Hursh, American Law of Products Liability, § 5A:7.) Thus where the seller has reason to anticipate that danger may result from a particular use of his product and he fails to give adequate warning of such a danger, a product sold without such warning is in a defective condition. (*Canifax* v. *Hercules Powder Co., supra*; *Gherna* v. *Ford Motor Co., supra*; *Barth* v. *B. F. Goodrich Tire Co., supra.*) This rule has also been applied to products, such as drugs, which are unavoidably unsafe because in the present state of human knowledge they are incapable of being made safe for their intended use. Accordingly, such a product, properly prepared and accompanied by proper directions and warning, is neither defective nor unreasonably dangerous. (*Toole* v. *Richardson-Merrell Inc., supra,* at pp. 708-711; see Rest. 2d Torts, § 402A, com. k; and see *Davis* v. *Wyeth Laboratories, Inc., supra,* at pp. 127-129; where the rule was applied to Type III Sabin vaccine.) This rule is not pertinent to this appeal, since the case was not tried on the theory that this principle of strict liability in tort was applicable to the facts of this case; nor is the rule contended for or urged by plaintiffs.

criteria were met and plaintiffs met all of these criteria. First, the disease must occur from four to 30 days after ingestion, the disease must be clinically consistent with paralytic polio, and the laboratory findings must not exclude the possibility of a vaccine relationship.[8] In state and federal laboratory tests, stool and blood samples from both plaintiffs were found to contain Type I polio virus. These tests ruled out any infection by polio Type II or Type III, and other causes of infection. Laboratory tests of the polio strains recovered from plaintiffs identified the infection as recent and as Type I "vaccine-like." None of the tests disclosed the presence of a wild-virus strain.

In addition, testimony was elicited from each of the attending physicians as to their opinion of the cause of the disease. Dr. Richard Wheat, who treated plaintiff Grinnell, testified that in his "own considered opinion" the disease of his patient was "related to the oral polio vaccine which he ingested." Plaintiff Benedetti's physician, Dr. Victor Sbarbaro, testified over objection that in terms of reasonable probability, the polio contracted by his patient was caused by the oral vaccine. ▮▮▮▮ Defendant now especially urges that the testimony of these doctors must be disregarded on the question of causation because neither man was a qualified epidemiologist.[9] There is no merit in this proposition since the qualifications of each physician were accpted by the court. ▮▮▮▮ "It is for the trial court to determine, in the exercise of a sound discretion, the competency and qualification of an expert witness to give his opinion in evidence [citation], and its ruling will not be disturbed upon appeal unless a manifest abuse of that discretion is shown. [Citations.]" (*Huffman* v. *Lindquist*, 37 Cal.2d 465, 476 [234 P.2d 34, 29 A.L.R.2d 485]; *People* v. *Hamilton*, 254 Cal.App.2d 462, 469 [62 Cal.Rptr. 261].) ▮▮▮▮ Here it cannot be said that the trial court abused its discretion. No showing of such abuse has been made by defendant; rather the matters complained of by defendant as going to the qualification of these witnesses have to do with the weight of their testimony and not to its admissibility. In this regard, we note that the court specifically instructed the

---

[8]Following even further criteria, the special advisory committee also classified plaintiff Grinnell as "compatible-probable."

[9]Dr. Wheat's qualifications were not challenged at trial. However, Dr. Sbarbaro was subject to *voir dire* which revealed that in his career he had encountered only two polio cases.

jury to weigh the "relative credibility and knowledge" of the expert witnesses in its deliberations.

In view of the foregoing we conclude that there was substantial circumstantial evidence from which the jury could infer that defendant's oral polio vaccine was the cause of the polio suffered by plaintiffs. They were also entitled to infer from the evidence that if the vaccine caused the polio, it was defective. (See *Vaccarezza* v. *Sanguinetti, supra,* 71 Cal.App. 2d 687, 691-692, 697-702.)

### Express Warranty

Plaintiffs contended in the court below that defendant made and breached an express warranty. Upon the evidence adduced, the case was also submitted to the jury on the theory of express warranty. Defendant contends that there was insufficient evidence to show that an express warranty was either made or breached.

In support of their theory of express warranty plaintiffs rely upon various representations as to the safety of the vaccine made by BAMAC during its pre-immunization publicity campaign which they claim were induced by defendant, and upon language contained in a package insert which accompanied the vaccine.

Before discussing the points raised by defendant we observe that at the time of the transactions in this case, the doctrine of express warranty was set out in Civil Code section 1732 as "Any affirmation of fact or any promise by the seller relating to the goods . . . if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon."[10]

Adverting to the publicity campaign issue, we note that counsel for all parties argue extensively as to whether BAMAC releases publicizing the vaccine as "safe" constitute express warranties by defendant. Much discussion is devoted to showing defendant's participation in the BAMAC program in an attempt to demonstrate defendant's responsibility for the advertising campaign.[11] However, we need not give ex-

---

[10]Civil Code section 1732 was repealed and re-enacted, with changes, as Commercial Code section 2313, effective January 1, 1965.

[11]The record discloses that defendant's only connection with the publicity campaign was that a representative of defendant was present at BAMAC meetings during which BAMAC publicity releases were approved, and that an employee of defendant's Public Information Department obtained for BAMAC's publicity representative a clipping book

tended consideration to this discussion because the court instructed the jury that plaintiffs could "not base a recovery on the theory of express warranty against this defendant on any statements or representation made by anyone other than the defendant or its agents in newspapers, on the radio or television, or otherwise." We presume that the jurors were true to their oaths and followed this instruction of the court. (See *People* v. *Sparks,* 257 Cal.App.2d 306, 309 [64 Cal.Rptr. 682].) There was no evidence that defendant actually made any of the statements in the advertising media. Moreover, there was no evidence that BAMAC was an agent[12] of defendant and no instructions on any agency relationship between defendant and BAMAC were given. Therefore, we conclude that the jury must have reached its verdicts on a basis other than breach of the express warranty made in the news media.[13]

Directing our attention to the language of the package insert, we note it was as follows: "Precautions and contraindications. The Surgeon General's Advisory Committee on Poliomyelitis Control, February, 1962, indicated that, in light of present knowledge, 'There are no known contraindications to oral polio virus vaccines. This includes conditions previously of concern, such as tonsilectomy, tooth extraction, pregnancy, penicillin hypersensitivity, therapy with steriods, agammaglobulinemia, DPT inoculation, smallpox vaccination, *and others.*' " (Italics added.) Defendant contends that this language could not have constituted an express warranty because it did not itself warrant that there were no known contraindications to the use of Type I vaccine but merely quoted information from the Surgeon General's Advisory Committee. Defendant also argues that even if it be assumed that the subject language constituted an express warranty

containing news releases and stories which had appeared in Cleveland (Ohio) newspapers during the course of a Sabin vaccine program conducted in that city in June 1962.

[12]The question of agency is inconsequential under the rule of strict liability in tort. However, it is still crucial as to a cause of action for breach of express warranty. (*Alvarez* v. *Felker Mfg. Co., supra,* 230 Cal.App.2d 987, 996-997.)

[13]It is established that in a proper case express warranty liability can result from affirmations in newspaper advertising. (*Gherna* v. *Ford Motor Co., supra,* 246 Cal.App.2d 639, 652; *Lane* v. *C. A. Swanson & Sons,* 130 Cal.App.2d 210, 215 [278 P.2d 723].)

In *Davis* v. *Wyeth Laboratories, Inc., supra,* 399 F.2d 121, the court attached some significance to defendant's participation in the immunization program. However, the holding in that case did not involve express warranty or actual agency. (See p. 125.)

there was no breach of the warranty because the statement was true and defendant had no knowledge of any contra-indications to the use of the vaccine.

"An 'express warranty' means simply an undertaking or covenant that the thing which is the subject of the contract is or is not of a certain quality or capacity." (*Yuba Mfg. Co. v. Stone*, 39 Cal.App. 440, 444 [179 P. 418].) The essential ingredients of an express warranty are that there must be an affirmation of fact by the seller with reference to the thing sold, rather than a mere expression of the seller's opinion, belief, judgment or estimate, and that there be a reliance on such affirmation by the purchaser of the thing sold. (Former Civ. Code, § 1732; *Chamberlain Co. v. Allis-Chalmers Mfg. Co.*, 51 Cal.App.2d 520, 523-524 [125 P.2d 113]; *Miller v. Germain Seed etc. Co.*, 193 Cal. 62, 75 [222 P. 817, 32 A.L.R. 1215]; *Corporation of Presiding Bishop v. Cavanaugh*, 217 Cal.App.2d 492, 504 [32 Cal.Rptr. 144]; *Odell v. Frueh*, 146 Cal.App.2d 504, 508 [304 P.2d 45, 76 A.L.R.2d 345].) Moreover, "Where the party making the representations has superior knowledge regarding the subject matter of his representations, and the other party is so situated that he may reasonably rely on such supposed superior knowledge or special information, the representations may be considered as fact and not opinion. [Citations.]" (*Toole v. Richardson-Merrell Inc.*, *supra*, 251 Cal.App.2d 689, 706; *Haserot v. Keller*, 67 Cal.App. 659, 670 [228 P. 383].)

The language of the insert can clearly be construed as an affirmation of fact. But even if we assume that it was merely an expression of opinion, belief or judgment, there is ample evidence that defendant had a superior knowledge of the vaccine. Defendant was one of three drug manufacturers licensed by the United States government to produce and distribute the vaccine. It supplied written materials and booklets[14] to a large number of doctors throughout the country which contained the subject language of the insert and a letter which, in part, stated that defendant, "a prime supplier of all polio vaccines, will continue to keep the practicing physician well informed of new developments in this crucial area. . . ." In the light of this evidence the jury was entitled to infer that defendant possessed a superior knowledge concerning the vaccine and its effects, and that persons purchasing the vaccine could reasonably rely on such supposed

---

[14]The booklets and letters were mailed to 239,500 doctors.

superior knowledge or special information. (See *Toole* v. *Richardson-Merrell Inc., supra,* 251 Cal.App.2d at pp. 706-707.)

Defendant does not discuss whether or not these plaintiffs relied on the package insert. (See *Seely* v. *White Motor Co.,* 63 Cal.2d 9, 13 [45 Cal.Rptr. 17, 403 P.2d 145].) In this regard we note that if BAMAC relied on the language of the insert such reliance inured to the benefit of plaintiffs since BAMAC was acting as plaintiffs' agent in administering the vaccine. (See *Toole* v. *Richardson-Merrell Inc., supra,* 251 Cal. App.2d at p. 707.) In addition to the evidence discussed above concerning the written materials supplied to the medical profession generally, there was testimony by Dr. George W. Brice, a physician employed by defendant, that defendant anticipated that the public will rely upon what the doctors know about the vaccine. In the light of this evidence and the fact that the polio program was of vast dimensions, the jury could infer that the language of the insert was read by the doctors who comprised BAMAC, and that they relied upon it in administering the vaccine to those who participated in the program.

 Turning to the question whether the warranty was breached, the record discloses that before the date projected for the publicized mass immunization program the Surgeon General had issued new information indicating a risk of vaccine-induced polio to adults, and studies beginning in 1961 showed that there was a risk to those over 30 years of age. Evidence was also adduced of reports, prior to the immunization date, that attenuated strains of polio virus were genetically unstable, and that following the ingestion of oral polio vaccine several cases had been classified as compatible with vaccine-induced polio.[15] From these facts the jury was entitled to reasonably infer that the material issued by defendant was not accurate when it excluded all possible contraindications. Moreover, since the jury was entitled, as hereinbefore pointed out, to infer that the vaccine was defective and caused plaintiffs to contract polio, the jury was also entitled to conclude that the vaccine was not of the quality repre-

[15]There was also evidence that although agammaglobulinemia was listed as not contraindicated, a person with this deficiency had impairment of immunity. However, this would seem to go to the question of the effectiveness of the vaccine rather than its safety. Defendant in its closing brief discusses the fact that defendant did mention the possibility of mutation or reversion in the insert. But this information was not specifically related to any risk.

sented by defendant and that, therefore, defendant breached its express warranty.

It is immaterial whether defendant had actual knowledge of the contraindications. ''The obligation of a warranty is abolute, and is imposed as a matter of law irrespective of whether the seller knew or should have known of the falsity of his representations.'' (*Mary Pickford Co.* v. *Bayly Bros., Inc.*, 12 Cal.2d 501, 520 [86 P.2d 102] ; *Hayman* v. *Shoemake,* 203 Cal.App.2d 140, 152 [21 Cal.Rptr. 519] ; Prosser on Torts, (3d ed. 1964) p. 700.)

Defendant also contends that the court erred in allowing plaintiffs to show that defendant subsequently changed his package insert to reflect the view of the Special Advisory Committee to the Surgeon General on the risk involved to adults. This argument must be disregarded because the evidence of this change was allowed to come in without any objection by defense counsel.

### Alleged Errors in Instructions

Defendant argues that a number of the instructions to the jury were erroneous. First, it claims that instruction No. 17 was prejudicial. This instruction was a modification of California Jury Instruction, Civil (BAJI) No. 104-B and in its essentials stated that ''When the wrongful acts or omissions of two or more persons, when committed independently or in the course of jointly direct conduct, contribute concurrently and as a proximate cause to the injury of another, each of such persons is liable.'' Although the subject instruction is usually given in negligence cases, the court substituted the word ''wrongful'' for the word ''negligent,'' and also instructed the jury that no proof of negligence was required in the case. It is therefore clear that the subject instruction dealt with the question of proximate cause in relation to the defect in the subject vaccine and the breach of the alleged express warranty. The word ''wrongful'' has been considered proper terminology with respect to the breach of an implied contract of warranty (see *Rubino* v. *Utah Canning Co.*, 123 Cal.App.2d 18, 23 [266 P.2d 163]), and upon analogy is likewise applicable in cases based upon strict liability and express warranty. Although the instructions could have been couched in more explicit terms in the light of the theories upon which the case was tried, we see no prejudicial error in the giving of the instruction under the circumstances presented by the record before us.

 Next defendant complains because the court instructed (instruction No. 21) that there was no evidence of assumption of the risk and the jury should not consider the subject. This instruction was proper in view of the express representation by defense counsel to the court during the course of the trial that he was abandoning this defense.[16]

 Objection is made to instruction No. 30 which advised the jury that warranty disclaimers by defendant "have no legal significance if it is legally liable under the law." This was a proper instruction. (*Steven* v. *Fidelity & Cas. Co.*, 58 Cal.2d 862, 881-882 [27 Cal.Rptr. 172, 377 P.2d 284].) Moreover, the thrust of this objection is not clear since defendant admits that its liability could not be disclaimed.

 Defendant also argues that instructions Nos. 32 and 33 operated to his prejudice because they were argumentative. In these instructions the court informed the jury that defendant could not rely on the reports of the Surgeon General or on compliance with government regulations to exonerate itself from responsibility for breach of express warranty. These instructions seem only to properly express the law applicable to express warranty. (See *Mary Pickford Co.* v. *Bayly Bros., Inc.*, *supra*, 12 Cal.2d 501, 520; *Hayman* v. *Shoemake*, *supra*, 203 Cal.App.2d 140, 152.)

Defendant also objects to instruction No. 39 as argumentative. This instruction properly sets out the essence of section 402B of the Restatement Second of Torts, outlining the express warranty doctrine.[17]

 Instructions Nos. 40, 49 and 62 all deal with the effect of product hypersensitivity in a plaintiff. Defendant claims these instructions are in hopeless conflict. We do not agree. When reviewed in context we find that instruction No. 40 pertains properly to the express warranty count; instruction No. 49 applies to the strict liability count; and instruction No. 62 to the subject of damages. With respect to instruction 49 we note that since the instruction was couched in the context of implied warranties it was less restrictive than one properly based on strict liability and, to this extent, inured to defendant's favor. In any event, we perceive no prejudice to defendant in the giving of any of these instructions.

---

[16]Apparently defendant argues that the jury could have found the defense of assumption of the risk in the absence of any instruction.

[17]In instruction No. 41 the court also set out the definition of an express warranty as delineated in former Civil Code section 1732.

■ Lastly, defendant objects to instruction No. 42 because it allowed the jury to find defendant responsible for advertising statements made by its "agents." Defendant believes the jury would reason from this that BAMAC was defendant's agent. Since the court also instructed the jury that the agents of defendant were either its employees or officers, the instruction stated a correct principle of agency law. Moreover, there was no instruction on any agency relationship between defendant and BAMAC.

## Motion to Take Judicial Notice of Report

Following the briefing of this case and prior to oral argument, defendant moved that this court take judicial notice of a technical report of the Surgeon General of the United States, dated September 20, 1962, and entitled "The Association of Cases of Poliomyelitis With the Use of Type III Oral Poliomyelitis Vaccines." At oral argument this motion was argued and a decision thereon was deferred until the decision of this cause on the merits.

The basis of this motion is that the subject report was referred to both at the trial and in the briefs of the parties and that, therefore, it may be material to the determination of this appeal, and urges that this report was concerned essentially with Type III polio rather than Type I polio. We note, initially, that the record discloses that the subject report was not introduced in evidence as an exhibit, that it was merely referred to during the examination of Dr. Robert L. Magoffin, a witness for plaintiffs, that certain portions of it were read to the witness, and that no request was made of the court that it take judicial notice of the report.

■ Since the trial court could have taken judicial notice of the subject report had it been requested to do so (Evid. Code, §§ 452, 453), we may take judicial notice of it. (Evid. Code, § 459.) However, since the instant case was before a jury, the jury would have been instructed on the matter judicially noticed because the matters in the report were for the jury's determination. (Evid. Code, § 457.) Accordingly, as a reviewing court we can only take notice of the subject report insofar as it assists us in determining what portions of the report were before the jury and we therefore grant the motion for that limited purpose.

■ The record, as does the report itself, discloses that the subject report discussed Type I as well as Type III polio

cases occurring after the administration of oral polio vaccines during the current calendar year (1962), and stated that "of the two cases of polio reported following Type I administration only one was thought by the committee to be entirely compatible clinically with poliomyelitis." The record discloses, further, that counsel for plaintiff Grinnell then read from the report's "Discussion Summary" relating to 11 polio cases concerning which the following was stated: "When the risk is related to age it is apparent that adults are exposed to a greater hazard than are children." The report indicates that these 11 cases were Type III vaccine induced. We are powerless at this stage to remove from the mind of a jury long since discharged any impression that these 11 cases were Type I vaccine induced. However, we do not believe that the jury so believed because shortly after this reference was made counsel for defendant objected that Grinnell's counsel was referring to Type III cases in violation of a prior ruling of the trial court. Grinnell's counsel then specifically inquired of the witness as follows: "whether or not 50 percent of the Type I were compatible, there were two of them, one of them was compatible, and one was excluded." To this question the witness answered in the affirmative. Under the circumstances we are satisfied that the jury understood that the subject report referred to only two cases of polio following the administration of Type I vaccine.

The motion that this court take judicial notice of a Technical Report of the Surgeon General of the United States is granted for the limited purpose hereinbefore indicated. The orders denying defendant's motion for judgments notwithstanding the verdicts are affirmed. The judgments are affirmed.

Sims, J., and Elkington, J., concurred.

A petition for a rehearing was denied July 30, 1969, and appellant's petition for a hearing by the Supreme Court was denied August 27, 1969.