[No. G006922. Fourth Dist., Div. Three. Jan. 30, 1990.]

JUDY M. KHAN et al., Plaintiffs and Appellants, v.
SHILEY INCORPORATED et al., Defendants and Respondents.

**COUNSEL**

Robins, Kaplan, Miller & Ciresi, Bruce A. Finzen and Joseph L. Dunn for Plaintiffs and Appellants.

Palmieri, Tyler, Wiener, Wilhelm & Waldron, Frank C. Rothrock and L. Richard Rawls for Defendants and Respondents.

**OPINION**

**SONENSHINE, J.**—Plaintiffs appeal after the trial court granted summary judgment against them in their action involving an allegedly defective mechanical heart valve. They contend the court applied incorrect legal principles in concluding that in light of the fact the valve implanted in Judy M. Khan's heart had not yet malfunctioned, any grievances were speculative and their lawsuit premature.

I.

Judy Khan was 33 years old when, on July 29, 1983, a Bjork-Shiley convexo-concave valve was implanted in her heart to replace a diseased mitral valve. She had first learned about her condition six months earlier and was told she would die without the implant. Before the surgery, Khan

had been experiencing fatigue, double vision, exhaustion, and shortness of breath. Within two months of the operation, her symptoms were gone and she was "feeling good about life."

Khan had been advised of the risks associated with mechanical heart valves including the potential for blood clots and the possibility the valve would be rejected by her body. She also knew she would always be a slave to blood thinner medication. She was not, however, told there was a risk the valve might fracture.

In November 1985, Khan's surgeon informed her Shiley Incorporated had told him the implanted valve was within a group of valves being recalled due to a propensity to fracture.[1] He stated there had been numerous reports the valves were "falling apart and malfunctioning without notice resulting in death to the patients." According to information he received from Shiley, the risk of a second open-heart surgery was even higher than the risk of a malfunction. Further, because any malfunction could be fatal, she should go to the nearest hospital if her valve ceased to operate.[2]

Since learning of the recall, Khan's life has not been the same. Although she "made it through the surgery in excellent condition, [she] still face[s] the possibility of the valve falling apart inside of [her] heart and killing [her]. Knowing that [she] face[s] almost certain death without notice has made living a nightmare." She has been treated by three different mental health professionals for her emotional problems and has also experienced physical symptoms associated with her anxiety.[3]

In October 1986, Khan and her husband, M. Jan Khan filed a lawsuit against Shiley Incorporated and its parent company, Pfizer, Inc. A second amended complaint for damages, filed May 10, 1988,[4] sought both compensatory and punitive damages, and alleged eight causes of action, including negligence, fraud and misrepresentation, breach of warranty (express and implied), strict liability in tort, intentional infliction of emotional distress,

---

[1] Shiley's "Dear Doctor" letter dated October 14, 1985, indicates the valve in question had "a statistical fracture rate of 11 per 1,000 through three years of implantation."

[2] Sometime in 1984, Khan had read a newspaper article regarding faulty heart valves manufactured by Shiley. She knew hers was a "Shiley valve," but did not ascertain whether it was one of the faulty ones. Although she was prompted to look at her "Implantation Data" card, she did not contact Shiley.

[3] Khan's physical symptoms include an increased heart rate, abnormal heart rhythms and palpitations, increased blood pressure, stomach cramps and spasms, dizziness, headaches, hyperventilation, and lightheadedness.

[4] The law firm currently representing plaintiffs was substituted into the case in November 1987. Discovery began the following month with a demand for production of documents. A first amended complaint was filed in January 1988.

and, as to Jan Khan, negligent infliction of emotional distress and loss of consortium. It alleged "an extraordinary number of the more than 80,000 c-c valves implanted to date have malfunctioned as a direct and proximate result of conduct of the defendants as alleged herein, causing death or other serious injury and damages to those persons in whom the c-c valves were implanted and their spouses." While the complaint acknowledged Khan's valve "has not yet malfunctioned," it alleged it "is defective and likely to malfunction at any moment because of the conduct of the defendant[s] as alleged herein, thereby exposing [Khan] to the constant threat of imminent death or other serious physical injury and the anxiety, fear and emotional distress that results therefrom."

The complaint also alleged, in its second cause of action for fraud and misrepresentation, "[d]efendants fraudulently, intentionally and negligently misrepresented the characteristics and safety of the c-c valve and fraudulently, intentionally and negligently concealed material, adverse information regarding the characteristics and safety of the c-c valve. Defendants made these representations and concealed adverse information at a time when defendants knew, or should have known, that the c-c valve had defects, dangers and characteristics and was other than defendants had represented to physicians and the consuming public, including plaintiffs." Examples of defendants' conduct included misrepresentation as to the valve's safety and propensity to fail, failure to adequately test the valve, failure to provide adequate warnings which fairly reflected known risks, making of understatements in reports as to the failure rate when they knew the rate was much higher, and omission of material facts showing the valve had a history of strut fracture. Further, the complaint alleged defendants made these misrepresentations with the intention plaintiffs and their physicians would rely on them, thereby inducing selection of the Shiley valve.

On May 12th, defendants filed their motion for summary judgment. Supporting declarations[5] alleged, among other things, all heart valves have an inherent risk of failure and all heart valve recipients always face a risk of death. Further, the risk Khan's valve would fail actually decreased over time; the risk of fracture in heart valve recipients in their sixth postoperative year, such as Khan, is approximately 0.225 percent per annum. In essence, it was defendants' position California law does not recognize plaintiffs' causes of action "based upon their purported emotional distress for an alleged fear of future malfunction." Relying on Khan's 1988 deposition testimony, they asserted the valve had not malfunctioned and, in fact, had "saved [her] life through its effective performance for nearly five years."

---

[5] Declarations were submitted by Anthony L. Moulton, M.D., a specialist in thoracic surgery, and Steven S. Lewis, a statistical consultant employed by Shiley.

Plaintiffs opposed the motion,[6] insisting they had a legitimate claim for all medically verified emotional and physical injuries sustained by Khan after she learned of her dilemma. They argued the valve was defective, had been declared by the Food and Drug Administration (FDA) to be "adulterated,"[7] and, to date, had "killed and injured at least 243 people."[8]

Hearing on the motion was set for June 9th. Plaintiffs sought a continuance to enable them to discover further evidence claimed to be essential to their opposition. They argued defendants had not begun producing documents in response to their demand for production until May 17th, five days after the motion was served. Thus, by the time of the hearing, plaintiffs had examined only a fraction of the one million documents produced. The request was denied, and the hearing proceeded.

The court announced its tentative ruling was to grant the motion, noting "while some valves of this type have failed, there's no indication this valve has failed or will fail." It found "[t]here's been nobody injured yet." And, just before uttering its final decision, it exclaimed: "We've been asked to speculate about something that may or may not happen, and there is no allegation, nothing that's been presented in the opposition papers, that show any basis now that there is a defect. . . . [I]t's premature on that basis." In response to plaintiffs' counsel's inquiry as to the basis of the court's ruling on *each* of the various theories of liability, the court said, "You're premature."

## II.

■ Summary judgment is proper only when the evidence establishes there is no triable issue of material fact, on any theory, and the moving party is entitled to judgment as a matter of law. (*Lipson* v. *Superior Court* (1982) 31 Cal.3d 362, 374 [182 Cal.Rptr. 629, 644 P.2d 822].) "[E]ven

[6] Supporting declarations included those of Judy Khan; Demetre M. Nicoloff, M.D., a specialist in thoracic surgery; Anton S. Petran, C.P.A., a specialist in statistical sampling and analysis for business and industry; and Charles H. Holland, Ph.D., a clinical psychologist who had been treating Khan since early 1988.

[7] Documents which plaintiffs obtained from the FDA disclosed that in December 1985, after Shiley voluntarily recalled the valves, the FDA notified Shiley the recall was classified as class I. According to plaintiffs, this meant the FDA found the valve represented "a situation in which there is a reasonable probability that the use of, or exposure to, a violative product will cause serious adverse health consequences or death."

An internal memorandum dated December 18, 1985, issued by the FDA's recall and notification branch, office of compliance, stated: "We consider the product to be adulterated because the strut on the valves may fracture. The heart valves, if implanted, may malfunction and cause serious adverse health consequences or death as a result of strut fracture."

[8] Of the approximately 81,000 valves implanted as of April 1988, Shiley had received reports of 243 fractures. Plaintiffs assert two-thirds of those implantees have died.

where the plaintiff will bear the burden of establishing critical elements of his [or her] case at trial, the burden is on the party moving for summary judgment (in this case defendants) to establish an uncontested factual basis which will support judgment in his [or her] favor . . . ." [Citation.]" (*Pena v. W. H. Douthitt Steel & Supply Co.* (1986) 179 Cal.App.3d 924, 927-928 [225 Cal.Rptr. 76].)

However, "the failure of a party to submit evidence in opposition to the motion 'does not relieve the moving party of the burden of establishing the evidentiary facts of every element necessary to entitle him [or her] to a judgment.' [Citations.]" (179 Cal.App.3d at p. 929.) In other words, the moving party must negate the matters the resisting party would otherwise have to prove at trial.

"If the trial court has erred, either in failing to find a triable issue of fact where there is one, or in failing to apply undisputed facts to a correct principle of law, then the judgment must be reversed." (*Scroggs* v. *Coast Community College Dist.* (1987) 193 Cal.App.3d 1399, 1401 [239 Cal.Rptr. 916].)

Plaintiffs contend the trial court not only ignored uncontested material facts showing they have suffered injury and the valve is defective, but also failed to correctly apply settled principles of law. The gist of their argument is the court erred in acquiescing to defendants' argument that "malfunction" is an element in a products liability lawsuit. ■ They insist the owner of a product, functioning as intended[9] but containing an inherent defect which may cause the product to fail in the future, has an action against the manufacturer.[10] Plaintiffs are mistaken.

---

[9] Khan testified at her deposition the valve had "not yet" malfunctioned. She also responded affirmatively when asked if, to her knowledge, the valve has "worked properly" and has "done its job" since it was implanted in her heart.

Plaintiffs concede the valve "has not yet experienced complete structural disintegration due to strut fracture, with the resultant inevitable severe cardiac injury or death, that has plagued identical C-C valves." However, they insist the fact the group of valves which includes Khan's has been declared by the FDA to be "adulterated" establishes there is a design defect. They further assert defendants have not met their burden to establish the valve implanted in Khan's heart has *not* begun to fall apart. And they maintain there is a dispute as to whether the valve is "functioning as intended." Thus, if the valve is not functioning as intended, then it must be malfunctioning.

[10] Plaintiffs cite two cases for the proposition California courts have clearly recognized causes of action under theories of products liability absent product malfunction. Neither is applicable.

The issue in *Rose* v. *Medtronics, Inc.* (1980) 107 Cal.App.3d 150 [166 Cal.Rptr. 16], an action involving an allegedly defective heart pacemaker, was the suitability of the lawsuit for prosecution as a class action by 4,000 potential claimants whose pacemakers had already been replaced. Contrary to plaintiffs' assertion, the court did not rule the named plaintiff could proceed with his individual action despite the fact his pacemaker had not malfunc-

"Products liability is the name currently given to the area of the law involving the liability of those who supply goods or products for the use of others to purchasers, users, and bystanders for losses of various kinds *resulting from so-called defects in those products*." (Prosser & Keeton, Torts (5th ed. 1984) § 95, p. 677, italics added.) Possible theories of recovery include strict liability in tort, negligence (i.e., in creating or failing to discover a flaw, in failing to warn or failing adequately to warn, or in the sale of a defectively designed product), and breach of warranty (express and implied).

No matter which theory is utilized, however, where a plaintiff alleges a product is defective, proof that the product has malfunctioned is essential to establish liability for an injury *caused by the defect.* Indeed, as stated in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], "A manufacturer is strictly liable in tort when an article [it] places on the market, knowing that it is to be used without inspection for defects, proves to have a *defect that causes injury* to a human being" (*Id.*, at p. 62, italics added; see also 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1244, p. 679; *Grinnell* v. *Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424, 433 [79 Cal.Rptr. 369].)

This essential element of causation is missing here. Khan's alleged injury was not caused by any defect in the valve. Rather, it was caused, if at all, by the knowledge the valve may, at some future time, fracture. As counsel for defendants asserted at the hearing below: "The issue here is whether [the valve has] malfunctioned or not, and all the discovery in the world isn't going to shed any light on that. If her valve does malfunction, she will have a cause of action. [¶] She'll still have to prove it was a defective product, but that hasn't happened yet."[11]

---

tioned. And in *Anthony* v. *General Motors Corp.* (1973) 33 Cal.App.3d 699 [109 Cal.Rptr. 254], a class action lawsuit seeking the recall and replacement of allegedly defective wheels, the plaintiffs neither alleged personal injury nor sought consequential damages; all they wanted was the replacement of their vehicles' wheels.

[11] Judy Khan's lawsuit is not unique. Defendants have alerted us to a number of cases involving the same claims, including two unpublished United States Court of Appeal decisions and two rulings of the Los Angeles Superior Court. In three of them, summary judgment was granted in Shiley's favor. In one Los Angeles case, the trial judge found there was no viable cause of action in the absence of malfunction, stating "until [the valve] fails there is no proximate harm that I can see." In a fourth case, originating in the United States District Court for the District of Maryland, the plaintiff's claim was dismissed because Maryland law precludes recovery based on future harm unless the harm is more likely than not to occur.

The record reflects plaintiffs' attorneys have instituted virtually identical lawsuits against Shiley in Orange County Superior Court on behalf of 16 other valve recipients. At oral argument, Shiley's lawyer informed us 90 cases were pending.

## III.

Plaintiffs contend the court's "greatest error" was in failing to recognize that their verified emotional injuries entitle them to a jury determination of their claims under *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518]. Once again, they are confused.

*Molien* acknowledged that damages for emotional distress could be recovered, in the absence of physical injury, by an individual who is a direct victim of the defendant's negligent conduct and where it is foreseeable that serious emotional distress will result from such negligent conduct. ▮ Negligent infliction of emotional distress is *not,* however, an independent tort. (6 Witkin, *op. cit. supra*, Torts, § 838, p. 195.) As explained in *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583 [257 Cal.Rptr. 98, 770 P.2d 278]: "Damages for severe emotional distress . . . are recoverable *in a negligence action* when they result from the breach of a duty owed the plaintiff that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two." (*Id.*, at p. 590, italics added.)

Contrary to plaintiffs' assertion, Khan is not "the quintessential 'direct victim' as contemplated by *Molien* . . . ." Indeed, she has not yet been victimized. In the absence of product malfunction, Khan cannot establish defendants breached any duty owed to her.

Plaintiffs' reliance on *Barth* v. *Firestone Tire and Rubber Co.* (N.D.Cal. 1987) 661 F.Supp. 193 for the proposition that California law permits recovery for emotional injury caused by the fear of contracting a disease in the future, is also misplaced. In that class action lawsuit, an employee exposed to industrial chemicals asserted claims of fraudulent active concealment and misrepresentation, battery, intentional infliction of emotional distress, and unfair and deceptive trade practices. He alleged he suffered two forms of injury: injury to his immune system rendering him more susceptible to developing various forms of cancer, and injury through the increased risk of cancer. The defendant moved to dismiss on the ground the plaintiff failed to allege a present injury. The court found the plaintiff's allegations of injury to his immune system and the presence of diseases in their latency stage were sufficient for that purpose.

The court also remarked, noting it was unconcerned with problems of proof at that stage of the proceeding: "The plaintiff also clearly asserts a claim for emotional distress. He alleges that he suffers from fear of contacting serious and/or lethal diseases as a result of his exposure to the toxic

chemicals at the Firestone plant. These emotional injuries state a present injury upon which some claims for relief may be based." (661 F. Supp. at p. 196.)

We reject plaintiffs' assertion the quoted language "undeniably establishes that the court expressly found that the present fear of potential future harm constitutes an actionable claim." The plaintiff in *Barth* had a "legally cognizable injury [in which he alleged] damage to his immune system and the presence of diseases in their latency period." (661 F. Supp. at p. 197.) Thus, his emotional injuries constituted not a separate claim, but rather, an element of damages for the underlying legal injury. Here, Khan's alleged emotional injuries are not a basis for recovery absent a ground for imposing liability pursuant to a recognized cause of action. So long as the valve continues to function, no cause of action exists under any products liability theory.

## IV.

Finally, plaintiffs contend even if product malfunction is a prerequisite in a strict liability context, it has no bearing on causes of action for negligence,[12] breach of warranty, or fraud. They are partly correct. A cause of action does not presently exist under any theory premised on the *risk* the valve *may* malfunction in the future. This includes negligence, i.e., failure to warn, and breach of warranty. Allegations of fraud, however, are in a class by themselves.[13]

■ For purposes of establishing fraud, it matters not that the valve implanted in Khan's heart is still functioning, arguably as intended. Unlike the other theories, in which the safety and efficacy of the *product* is assailed, the fraud claim impugns defendants' *conduct.*

■ "The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to

---

[12] Plaintiffs contend *Vanoni* v. *Western Airlines* (1967) 247 Cal.App.2d 793 [56 Cal.Rptr. 115] supports their position that product malfunction is not required to establish negligence. In *Vanoni,* the plaintiffs alleged they suffered shock to their nervous systems when they thought the airplane in which they were traveling was going to crash. The trial court sustained a demurrer without leave to amend and the appellate court reversed, noting allegations of shock to one's nervous system are sufficient to state a physical injury. The case does not, however, purport to hold that one's fear something may happen in the future is, without more, actionable.

[13] We note that in only one of the cases referred to in footnote 11, *ante,* i.e., the Maryland case, did the complaint contain allegations of fraud. In affirming the lower court's dismissal of the lawsuit on the ground Maryland law precludes recovery unless there is a greater than 50 percent likelihood the injury will occur, the court did not separately address the claim of fraud.

induce reliance; (d) justifiable reliance; and (e) resulting damage. [Citations.]" (5 Witkin, *op. cit. supra*, Torts, § 676, p. 778.)

 Plaintiffs assert defendants misrepresented the characteristics and safety of the valve while concealing other material, adverse information. Specifically, they contend defendants misrepresented the valve's propensity to fail, and omitted material facts showing the product had a history of strut failure even before one was implanted into Khan's heart. And they did so with knowledge of the substantial risk of death and without providing adequate warnings which fairly reflected the known risks. Furthermore, defendants allegedly made these misrepresentations with the intention plaintiffs would rely on them in selecting the Shiley valve. Plaintiffs relied on and were induced by these representations in making their selection. They would not otherwise have selected the Shiley valve; indeed, at least six other mechanical heart valves were available at the time of Khan's surgery.

Plaintiffs' complaint contained allegations sufficient to state a cause of action for fraud. In moving for summary judgment, defendants essentially ignored plaintiffs' fraud theory, focusing instead on whether or not the valve had malfunctioned. In so doing, defendants failed to meet their burden to establish there was no triable issue of material fact with respect to the fraud claim. Thus, the motion was erroneously granted as to that cause of action and, accordingly, summary judgment was improper.

We reach this conclusion notwithstanding defendants' position that the unprecedented cause of action plaintiffs seek to establish is contrary to public policy. We recognize the role public policy has played, and continues to play, in the torts arena. However, our decision neither establishes a new cause of action nor drastically extends existing law.[14] It merely confirms that a manufacturer of a product may be liable for fraud when it conceals material product information from potential users. This is true whether the product is a mechanical heart valve or frozen yogurt.[15]

---

[14] Asserting the implanted valve has saved and, for more than five years, has sustained Khan's life, defendants maintain there are compelling reasons why a *new cause of action* should not be created. They contend if manufacturers faced liability to users of products based on product failures experienced by other users, "there would be no incentive to develop or manufacture heart valves or other critical medical devices and drugs. The consequences of such a drastic extension of existing law would be disastrous for health care in this country and would inundate the judicial system with an avalanche of premature and speculative claims."

At oral argument, counsel for defendants exclaimed that allowing plaintiffs to proceed with their fraud theory would similarly have a chilling effect on the manufacture of critical medical devices.

[15] We do not address the propriety of the trial court's refusal to continue the hearing to enable plaintiffs to conduct further discovery. So long as the valve continues to function, no

Judgment reversed.[16] Appellants shall receive costs on appeal.

Crosby, Acting P. J., and Mandel, J.,* concurred.

A petition for a rehearing was denied February 28, 1990, and respondents' petition for review by the Supreme Court was denied May 3, 1990. Mosk, J., was of the opinion that the petition should be granted.

---

amount of discovery could alter the fact that, in the context of products liability, Khan's alleged injury was not caused by a defect in the valve.

[16]Because defendants moved for summary judgment of the entire action and did not request summary adjudication of issues (Code Civ. Proc., § 437c, subd. (f)), the judgment must be reversed in its entirety. (*Barnick* v. *Longs Drug Stores, Inc.* (1988) 203 Cal.App.3d 377, 384 [250 Cal.Rptr. 10].)

*Assigned by the Chairperson of the Judicial Council.