[No. G037818. Fourth Dist., Div. Three. Oct. 27, 2008.]

ALEXIS SARTI, Plaintiff and Appellant, v.
SALT CREEK LTD., Defendant and Respondent.

COUNSEL

Bremer Whyte Brown & O'Meara, Keith Bremer, Tyler D. Offenhauser; Snell & Wilmer, Richard A. Derevan and Todd E. Lundell for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, Caroline E. Chan; Osman & Associates and Richard L. Scott for Defendant and Respondent.

OPINION

**SILLS, P. J.**—The trial judge in this case read *Minder v. Cielito Lindo Restaurant* (1977) 67 Cal.App.3d 1003 [136 Cal.Rptr. 915] (*Minder*) for the proposition that reasonable inferences are never, or hardly ever, available in food poisoning cases. Based entirely on the *Minder* opinion, he granted a judgment notwithstanding the verdict (often called a "jnov") even though the

judge himself made it clear he would have voted *with* the jury on the question of liability.[1]

We can understand why the judge was so cautious, but we do not think that *Minder*, strictly construed, should be read to preclude the use of reasonable inferences to show causation in food poisoning cases. To the degree that *Minder* may, arguendo, be susceptible for the proposition that inferences are unavailable in food poisoning cases, or that food poisoning defendants are somehow accorded a special, protected status with an abnormally "heightened" standard of causation, we respectfully decline to follow it. Despite intimations in the *Minder* opinion to the contrary, food poisoning cases are governed by the same basic rules of causation that govern other tort cases. Reasonable inferences drawn from substantial evidence are indeed available to show causation. We will therefore reverse the jnov and order reinstatement of the original verdict.

---

[1] We apologize for a long opinion with many topics and subheadings. For the convenience of readers who might like an overview of this opinion, here is an organizational outline:

I. BACKGROUND
II. ANALYSIS
 A. The *Minder* Case
 1. Overview
 2. The *Minder* Facts
 3. *Minder*, Strictly Construed
 4. The *Minder* Analysis
 5. A Critique of the *Minder* Analysis
 a. *Minder*'s general departure from established rules of tort causation
 b. *Minder*'s departure from established case law allowing use of reasonable inferences
 i. *Dougherty v. Lee*
 ii. *Grinnell v. Pfizer*
 c. *Minder*'s preference for a rule requiring exclusion of all possible alternative causes also departed from case law
 d. *Minder*'s variance from current California tort law regarding the standard of causation
 e. *Minder*'s miscitation of the *Beaupre* decision
 B. The Case Before Us
 1. The Inference Here Was Reasonable
 2. Salt Creek's Rule-out-all-alternatives Argument: In Its Direct Form
 3. Salt Creek's Rule-out-all-alternatives Argument: Its "Gotcha" Form (Based on Acquiescence to a Bad Jury Instruction)
 C. The Cross-appeal
 1. The Consistency Issue
 2. The Jury Misconduct Issue
III. DISPOSITION

## I. BACKGROUND

On April 7, 2005, Alexis Sarti and a friend ate at the Salt Creek Grille. They split an appetizer consisting of raw ahi tuna, avocado, cucumbers and soy sauce. Sarti became nauseous and chilled the next day. The day after that she suffered constant diarrhea, fever and chills. The diarrhea continued for the next 10 days. By April 19, Sarti was unable to move her legs and was having a hard time focusing her eyes. Her mother called the paramedics, who took her to the emergency room. Her admitting physician took a "food history." She was put into intensive care, where a neurologist diagnosed a variant of Guillain-Barré syndrome (a disease that damages peripheral nerves). She was tested, and found to have campylobacter bacteria, which was the only pathogen found in the sample. Expert testimony would later indicate that Sarti's Guillain-Barré was an idiosyncratic immunosuppressant reaction to the constant diarrhea brought on from campylobacter.

Campylobacter is *not* found in raw tuna, unless that tuna has been cross-contaminated by raw chicken, where the bacteria is common. Sarti's sickness was reported to the Orange County Health Department. The report resulted in a "food borne illness" report dated May 5, 2005—a little less than a month after the meal. The report identified four practices at the Salt Creek Grille that could lead to cross-contamination. Specifically: Wipe-down rags were not being sanitized between wiping down surfaces. There was also an insufficient amount of sanitizer in the dishwasher. Chicken tongs were sometimes used for other food (the tongs would take raw chicken off the grill and then cooked food would be touched with the same tongs). Raw vegetables were stored under "raw meat" (the expert testifying did not say what kind of raw meat), so that a drop of raw meat juice might get on the vegetables. There was also testimony that the waiter who served Sarti had used a wet, unsanitized rag stored underneath the bar to wipe down Sarti's table.

Sarti, who was about 21 years old at the time she became ill, never completely recovered. She had to use a walker for eight months, and to this day retains only about 40 percent of what would have been her normal endurance. She sued the partnership that owns the Salt Creek Grille for breach of warranty.

There was plenty of substantial evidence on which the jury could have found the restaurant *not* liable: Sarti's friend who split the appetizer did not get sick. The Salt Creek Grille takes great pains to separate its raw tuna from its raw chicken, including defrosting it in a different place in the walk-in

freezer than where the chicken is stored, having the chef use a newly cleaned cutting board for the tuna, and preparing the tuna at the opposite end of the cook's line from where the chicken is cooked. Chicken is prepared in its own separate room. Different colored cutting boards are used for tuna and chicken, and the same chef does not prepare both items. And Sarti herself worked as a supermarket checker the day she became ill, and could, at least in theory, have picked up campylobacter from a leaking bag of raw chicken she might have scanned.

But the jury didn't find the restaurant not liable. The jury returned a verdict of $725,000 in economic damages and $2.5 million in noneconomic damages (obviously pain and suffering). The trial judge perceived that the jury's verdict was based on the *inference* that the practice of using the same wipe-down rag (or storing raw meat over raw vegetables, or touching cooked food with chicken tongs that had previously touched raw chicken) had led to cross-contamination from raw chicken to raw tuna.

The trial judge himself was plain that he believed that Sarti had indeed presented "the jury with sufficient evidence to avoid a jnov." Indeed, he said, referring to his role as "13th juror," that "I must say *I would have voted with the jury on the question of liability* in this case." (Italics added.) He elaborated: "I think this case was tried well within the profile of what I routinely see in negligence cases and, for that matter, breach of warranty cases. . . . I think Ms. Sarti won this case fair and square except . . . ."

Except for the one thing that brings us to the instant appeal. The trial judge read *Minder, supra*, 67 Cal.App.3d 1003, for the black-letter rule of law that inferences are off-limits to prove a food poisoning case. (The remainder of his "fair and square except" comment was: ". . . for what I perceive to be as the heightened causation requirements of the *Minder* case.")

The trial judge had earlier noted that *Minder* "found that causation had not been shown as a matter of law." Continuing, he said, "and that means to me that the concept of inferences, which are otherwise permitted in civil cases, apparently play little or no role in food poisoning cases. And remember, an inference is not evidence itself, an inference is the result of reasoning based upon collateral evidence." He made it clear that it was only under the compulsion of the *Minder* case that he granted the restaurant's motion for judgment notwithstanding the verdict.

## II. ANALYSIS

### A. The *Minder* Case

#### 1. *Overview*

■ It is understandable why the trial judge here ruled as he did. All trial courts are bound by all published decisions of the Court of Appeal (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]), the only qualifications being that the relevant point in the appellate decision must not have been disapproved by the California Supreme Court and must not be in conflict with another appellate decision. As the Supreme Court said in *Auto Equity Sales* (a case that ought to be covered in the very first weeks of every legal research and writing class in any California law school): "Under the doctrine of stare decisis, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction. Otherwise, the doctrine of stare decisis makes no sense. The decisions of this court are binding upon and must be followed by all the state courts of California. *Decisions of every division of the District Courts of Appeal are binding upon all the justice and municipal courts and upon all the superior courts of this state*, and this is so whether or not the superior court is acting as a trial or appellate court. Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction." (*Ibid.*, italics added and omitted.)[2]

Unlike at least some federal intermediate appellate courts,[3] though, there is no horizontal stare decisis in the California Court of Appeal.[4] *This* court—this panel—is not bound by *Minder* and we may take a more critical

---

[2] The passage means that a trial judge sitting in San Francisco is equally bound by decisions from divisions of the Court of Appeal sitting in Fresno, San Diego and even Orange County just as much as he or she is bound by decisions by a panel sitting in San Francisco. California doesn't work the way the federal courts do, with so-called "rules of the circuit" where a trial judge is bound to a given intermediate appellate subdivision.

[3] For example, the sprawling Ninth Circuit adheres to a rule of "intracircuit stare decisis" because consistency would otherwise be impossible. (Ulrich & Sidley Austin LLP, 1 Fed. Appellate Prac. Guide 9th Cir. 2d § 8:19 (accessible on Westlaw, database updated Apr. 2008) ["The Ninth Circuit's 28 authorized, active judges can be combined into 3,276 different three-judge panels . . . . The principal way the Ninth Circuit avoids having these shifting three-judge panels issue conflicting decisions is to follow a rule of intracircuit stare decisis: panel decisions bind subsequent panels except in certain narrow situations discussed below or unless overruled by the court en banc."].)

[4] (E.g., *Jessen v. Mentor Corp.* (2008) 158 Cal.App.4th 1480, 1489, fn. 10 [71 Cal.Rptr.3d 714] ["Contrary to Jessen's contention, we are not bound by the contrary decision by Division One of this court . . . . ' "One district or division may refuse to follow a prior decision of a different district or division, for the same reasons that influence the federal Courts of Appeals of the various circuits to make independent decisions." ' " (Citation omitted.)].)

approach to that opinion. Strictly construed, *Minder* simply held in the case before it that there wasn't enough evidence upon which a reasonable inference could be drawn that the *particular kind* of unsanitary practices found at the restaurant could be linked to the *particular kind* of food poisoning sustained by the plaintiffs. To the degree that, for sake of argument, *Minder* stands for more than just that (e.g., as standing for a rule that unsanitary conditions are per se insufficient to establish a reasonable inference of food poisoning), we respectfully decline to follow it.

### 2. *The* Minder *Facts*

A couple ate a Sunday afternoon lunch at a Mexican restaurant, apparently in company with another couple. The husband felt a stomach upset thereafter. Three days later he began sweating and developed a fever. Meanwhile his wife felt a little nauseated on that Sunday afternoon, and her symptoms lasted for two days, when she became feverish and chilled. After a culture it was determined that both of them had Shigella Flexneri, Group B.

In subsequent litigation against the Mexican restaurant, there was evidence that about two months before, a health inspector had "observed dirt, grease and food particles in the corners of the floor and behind the stove." (*Minder, supra*, 67 Cal.App.3d at p. 1007.) Other unsanitary conditions included an ice machine without a side panel (hence susceptible to dust and flies), and food stored directly on the floor. And, when the health inspector revisited the restaurant a little more than a month prior to the plaintiffs' lunch, conditions had not changed. Another inspection a month afterwards yielded the same result, so the inspector requested stool samples of all food handlers and employees. The result was " 'no enteric' "—which means not within the intestine. (*Ibid.*) And because of those results, the inspector was "unable to form any conclusions or opinion with respect to whether or not a food poisoning case had occurred." (*Ibid.*) There was also evidence of "certain" health and safety violations from an inspector who visited the restaurant about two years prior to the plaintiffs' meal, and he noted "certain violations" of the Health and Safety Code, though the *Minder* court did not enumerate what they were. (*Ibid.*)

However, the couple's treating physician gave opinion testimony that their illness "occurred as a result of [the] contaminated food" they had eaten that Sunday. (*Minder, supra*, 67 Cal.App.3d at p. 1006.)

Despite the treating physician's testimony and the *general* evidence of unsanitary conditions, the *Minder* court reversed awards of about $6,000 each in favor of the couple, concluding that they had not "met their burden of

showing that the probable cause of their illness was contaminated food" at the Mexican restaurant. (*Minder, supra,* 67 Cal.App.3d at p. 1008.)

### 3. Minder, *Strictly Construed*

Let us now analyze the nature of the plaintiffs' case in *Minder*. There was evidence of unsanitary conditions, including the opening of the ice machine to flies and dust, dirt and grease, and food stored directly on the floor. Those conditions raised the question: Would it have been reasonable for the trier of fact to *infer* a link between the unsanitary conditions and the illness that the treating doctor opined came from food poisoning contracted the day the couple ate at the restaurant?

Reading *Minder* strictly, there simply wasn't enough of a specific link between the *particular* kind of food poisoning (Shigella Flexneri, Group B) and any *particular* unsanitary condition at the restaurant. The opinion, for example, sets forth no facts indicating *how* "observed dirt, grease and food particles in the corners of the floor and behind the stove," or how the possibility of contamination of ice to dust and flies, or how food stored directly on the floor, causes Shigella Flexneri. The opinion recounts no expert testimony making the link.

To be sure, the testimony from the plaintiffs' treating physician comes close, but there is nothing in his testimony, at least as recounted by the *Minder* court, that actually connected the Shigella Flexneri to the unsanitary conditions found at the restaurant. The one person who might have given an opinion making the link—the health inspector who requested the stool samples from the restaurant's employees—conspicuously was "unable to form any conclusions." (See *Minder, supra,* 67 Cal.App.3d at p. 1007.)

To sum up: In *Minder*, even with the testimony of the treating physician, there was no evidence to reasonably infer a link between the particular kind of food poisoning involved and the specific unsanitary conditions at the restaurant.

### 4. *The* Minder *Analysis*

It is one thing for an appellate court to arrive at a sound result. It is quite another to arrive at a sound result in conformity with settled law. While *Minder*'s result, strictly construed, may be sound, much of the analysis by which it got there was seriously flawed.

The *Minder* court began its legal discussion with the proposition, taken from a Missouri Supreme Court case (*Stewart v. Martin* (1944) 353 Mo. 1 [181 S.W.2d 657]), that merely showing that someone " 'became sick' " after eating at a restaurant does not establish that " 'unwholesome' " food served at the restaurant caused the illness, or even establish a " 'prima facie case' " that food served at the restaurant caused it. (*Id.*, 181 S.W.2d at p. 658.) That idea was immediately reiterated with a quotation from an Arkansas Supreme Court case (*Franke's, Incorporated v. Bennett* (1941) 201 Ark. 649 [146 S.W.2d 163]), the point of which was that " ' "the proof must go further" ' " than mere after-the-restaurant-meal illness. (*Minder, supra*, 67 Cal.App.3d at p. 1008.)

So far so good. The *Minder* court was merely making the point that the logical fallacy of "post hoc, ergo propter hoc" (after the fact, therefore because of the fact) is not available to win a food poisoning case. And of course no one can reasonably quarrel with that particular supposition. Just because you get sick soon after eating at a restaurant doesn't prove bad food or some other contamination at the restaurant caused it. Any other rule would be untenable, since it would make restaurants de facto health insurers of their customers.

The *Minder* court then repeated the same thought again, this time by quoting a passage from a Missouri appellate court about illness following a swig of cola being insufficient. (*Williams v. Coca-Cola Bottling Company* (Mo.Ct.App. 1955) 285 S.W.2d 53, 57.) Then it noted that in the case *sub judice* there was "no evidence that the food, drinks, dishes, silverware, etc., appeared to be contaminated in any way." (*Minder, supra*, 67 Cal.App.3d at p. 1009.) Again, so far so good.

At that point the *Minder* court listed a series of common scenarios about what might, or might not, show causation in food poisoning cases. It was at this point that the court's analysis began to stray from established California rules of causation. The main source for these scenarios appears to have been a looseleaf treatise, 2 Frumer and Friedman, Products Liability, as it stood in 1977.

The first scenario was other people getting sick from "the same food" at about the same time. The *Minder* court quickly (and gratuitously) opined that the fact that other people get sick at the same time from the same restaurant was "not controlling." The supporting quote from the Frumer and Friedman treatise, however, didn't exactly spin the point that way. The quote said that other people getting sick at the same time " '*may* justify a finding of

unwholesomeness,' " but also that other people *not* getting sick " '*may* justify a converse result.' " (*Minder, supra*, 67 Cal.App.3d at p. 1009, quoting 2 Frumer & Friedman, Products Liability [looseleaf treatise as of 1977[5]] p. 667, italics added.) The *Minder* court then added, without authority, that it was "not inclined to be overly impressed" with other-people-getting-sick-at-the-same-time evidence, but noted in any event that the husband in the other couple who ate with the plaintiffs at the Mexican restaurant was unaffected, and while his pregnant wife had diarrhea a few days later, "her doctor could not diagnose the cause." (*Minder, supra*, 67 Cal.App.3d at p. 1009.)

The second scenario was a "process of elimination," which apparently the *Minder* court was more inclined to be "impressed" with, e.g., if other persons ate everything that the plaintiff ate except for one thing (the court's example was a tamale), that would point to that one thing as "the cause of illness." (*Minder, supra*, 67 Cal.App.3d at p. 1009.) There was no such evidence, though, in *Minder*.

The third scenario was a "[s]cientific analysis of the food" itself, but the court noted that none of the food in the case was analyzed and stool samples of the restaurant employees proved negative. (*Minder, supra*, 67 Cal.App.3d at p. 1009.)

And, then, finally, the *Minder* court listed a catchall "Other causes" category. The *Minder* court, however, did not actually define the category in terms of those items of evidence that might prove causation, as much as it was articulating a reason to reject causation. Thus immediately after introducing the category, "Other causes," the court began with a sentence to the effect that if the illness was "explainable on grounds other than unwholesomeness," then "it may be necessary to exclude such causes." (*Minder, supra*, 67 Cal.App.3d at p. 1009.)

Reading just that sentence, it is not clear what the court meant, though one can perhaps detect the intimation of a rule that the plaintiffs in food poisoning cases must rule out all other possible causes to prevail. (As we will soon see, at least one California food poisoning case had already rejected the rule-out-all-other-possibilities rule.) The example the *Minder* court gave immediately after its statement came from a Georgia appellate case (*Payton v. Lee* (1953) 88 Ga.App. 422 [77 S.E.2d 77]). In that Georgia case, according to *Minder*, the fact that the plaintiff fell ill after eating potato salad and her illness was diagnosed by her physician as food poisoning was insufficient because the

---

[5] Because the Frumer and Friedman Products Liability treatise is kept and updated in a looseleaf format, our court librarian informs us that it is practically impossible to reconstitute the treatise exactly as it was read by the *Minder* court in 1977.

plaintiff had not excluded the possibility of her food poisoning being caused by a viral infection going around in the community at the time. (*Minder, supra,* 67 Cal.App.3d at p. 1010.)

The *Minder* court next noted that testimony in the case before it that *if* the plaintiffs, or even one of them, had eaten at "a restaurant" the day before they ate at the defendant's restaurant, it was "just as logical that the contamination could have resulted therefrom" (presumably meaning, at the other restaurant) or had "come from a source other than food." (*Minder, supra,* 67 Cal.App.3d at p. 1010.) And then the court pointed out that neither plaintiff could recall "whether they had eaten at home or at a restaurant, or both, on" the day before they ate at the defendant's restaurant. (*Ibid.*)

At that point in the opinion the *Minder* court shifted its organizational structure from a list of scenarios to a reliance on precedent, namely the case cited earlier from the Missouri Supreme Court, *Stewart v. Martin.* The *Minder* court said the facts before it were "very similar" to those in *Stewart.* (*Minder, supra,* 67 Cal.App.3d at p. 1010.)

In *Stewart,* the plaintiff became ill after eating a ham sandwich at a restaurant, and his treating physician said it was food poisoning. However, the plaintiff had eaten or drank on four different occasions within the 18 hours before becoming sick, and there was " 'no medical testimony whatever' " to " 'prove' " that eating the ham sandwich caused the illness. (*Minder, supra,* 67 Cal.App.3d at p. 1010.) Again, one can detect in the *Minder* court's discussion of *Stewart* (as in its discussion of *Payton*) the whisper of a preference for a bright-line rule requiring food poisoning plaintiffs to rule out all other possible causes of food poisoning in order to prevail, though the *Minder* court never quite dared speak its name.

At this point the *Minder* opinion had two more substantive paragraphs to go and it had yet to confront the plaintiffs' strongest evidence (other than, arguably, the treating physician's opinion). That was the evidence of the health violations noted by previous health inspectors.

The *Minder* court began by noting that two health inspectors had testified as to "certain unsanitary conditions" found at the restaurant (conspicuously not recounted in the opinion at that point), and then flatly declared: "These conditions, absent further evidence, could not establish probable cause." (*Minder, supra,* 67 Cal.App.3d at p. 1010.)

Let's stop here for a second. Where did that phrase "probable cause" come from? The phrase first appeared in the court's statement of the "sole issue on appeal" (*Minder, supra,* 67 Cal.App.3d at p. 1008), and then twice in the way

the court framed the scenarios it had just discussed (see *id.* at p. 1009 ["can support an inference of probable cause"]). But the *Minder* court never actually provided any authority for the proposition that a plaintiff in a food poisoning case must "establish probable cause," it just seemed to assume that everybody already knew that "probable cause" was the standard—except to the extent that, after its flat declaration, it impliedly supported its statement with what came next, which was a précis of the only California authority the *Minder* court relied on, the case of *Beaupre v. Nave* (1970) 13 Cal.App.3d 402 [91 Cal.Rptr. 473] (*Beaupre*).

Before we discuss how the *Minder* court handled *Beaupre*, let's look at the *Beaupre* decision itself first. In *Beaupre*, unrelated plaintiffs sued the owners of a restaurant for having contracted hepatitis. The 1970 *Beaupre* opinion treats hepatitis as one disease, and gives no hint that the disease may be classified into the various types, A, B, C, et cetera, that we now, in 2008, take for granted. In fact, the court would recount that the "cause of the illness from which each plaintiff suffered is not so well known that we may rely upon any causative evidence other than that produced through the testimony of the medical experts" (*Beaupre, supra,* 13 Cal.App.3d at p. 404), a comment which, of course, is out of date. Everybody with Internet access can now know that *some forms* of hepatitis are enteric and thus can be transmitted via food.

In any event, one must read *Beaupre* carefully in order to ascertain the decision's "procedural posture," that is, how the case got to the Court of Appeal from the trial court. The procedural posture of the case is mentioned rather casually, literally as an afterthought in a sentence primarily devoted to what was then the current state of knowledge about hepatitis.[6] But in that sentence one learns that the case was tried to the court, "sitting without a jury," and the court, *as trier of fact*, had made "finding[s] of fact" adverse to the plaintiffs. So, the conflicts and inferences in the evidence *had* to be drawn in favor of the defendant restaurant, which is what the *Beaupre* court said in the next sentence. And the appropriate resolution of the conflicts and inferences meant, as the *Beaupre* court said next, that in order for the *plaintiffs* to prevail on appeal, the evidence had to be clear, certain, "without dispute," and point "unerringly to the determination of a particular issue." (*Beaupre, supra,* 13 Cal.App.3d at p. 404.)

---

[6] Here's the sentence: "The cause of the illness from which each plaintiff suffered is not so well known that we may rely upon any causative evidence other than that produced through the testimony of the medical experts, and since this appeal seeks to reverse the finding of fact on the issue of causation drawn by the trial judge sitting without a jury, we look only to that evidence which would support his conclusion." (*Beaupre, supra,* 13 Cal.App.3d at p. 404.)

In short, the plaintiffs in *Beaupre* were contending on appeal that they *had* to win on the causation issue, *as a matter of law*. And, of course, they lost, because there was substantial evidence to support a defense verdict: The *Beaupre* court needed merely to recount a few points to demolish the plaintiffs' hopes of winning on appeal. (Those points were: one medical expert gave only 10 percent odds that the plaintiffs had contracted hepatitis at the defendant restaurant, another expert testified that food-borne hepatitis was extremely rare worldwide (only 10 to 20 food-borne outbreaks *ever*), and there was expert testimony to the effect that, given the respective dates of the outbreaks, the food handler could not have transmitted the disease. (*Beaupre, supra*, 13 Cal.App.3d at pp. 404–405.))

Later in the opinion the *Beaupre* court did allude to "various sanitation violations" (*Beaupre, supra*, 13 Cal.App.3d at p. 405), but that was in the context of quoting some of the trial court's *other* findings which were being challenged on appeal. (The *Beaupre* opinion had a way of backing into some important facts.)[7] Specifically, findings 8 and 9 of the trial court did, indeed, acknowledge that " 'From time to time, the food, beverages, utensils, bathroom and floors of the restaurant were unclean . . .' " and also " 'not reasonably fit for the purpose for which they were intended.' " (13 Cal.App.3d at p. 406.)

The point of that whole discussion, though, was that the trial court had clearly found, as a matter of fact, that any sanitation violations were neither the "proximate cause" nor the "cause in fact" of the plaintiffs' hepatitis. (*Beaupre, supra*, 13 Cal.App.3d at p. 407, italics omitted.) Thus the "sum" of all the findings—that is, even with a recognition of some sanitation violations—fell "short of the necessary finding that anything that the defendants did or failed to do *caused* any injury to the plaintiffs." (*Ibid.*, original italics.) And so the trial court's judgment for the defendant restaurant was affirmed. The plaintiffs did not win, that is, did not win in the appellate court as a matter of law when they had lost according to the trier of fact.

We now turn to how the *Minder* court treated *Beaupre*, which is to be found in *Minder*'s third-to-the-last paragraph. As we just noted, the *Beaupre* decision was used by *Minder* as implied support for the flat proposition that certain unsanitary conditions, "absent further evidence"—and apparently, by "further evidence," the *Minder* court meant that the opinion of the treating physician didn't count for anything—could not "establish probable cause." (*Minder, supra*, 67 Cal.App.3d at p. 1010.) It is a four-sentence passage (all

---

[7] Shakespeare had Brutus do the same thing in his speech to the crowd in Julius Caesar. As Judge Posner points out, Brutus "buried" the best reason he had to assassinate Julius Caesar—" 'but, as he was ambitious, I slew him' "—in a subordinate clause. (Posner, Law and Literature: A Misunderstood Relation (Harvard University Press 1988) p. 278.)

of which is now quoted in this footnote),[8] leading to a punch line conclusion in the subsequent paragraph that the plaintiffs' evidence was insufficient. Here is the substance of each of those four sentences:

Sentence one: a restatement of the plaintiffs' allegation they contracted hepatitis from eating at the defendant restaurant. Sentence two: a quotation from findings of the *Beaupre* trial court acknowledging unclean food, beverages, et cetera, from time to time. (And with *no* mention of the trial court's other findings specifically rejecting causation as a matter of fact.) Sentence three: a statement that the trial court in *Beaupre* found the plaintiffs had "failed to prove causation." (And—to be a bit repetitive ourselves—with no mention of the trial court's role as a finder of fact.) Sentence four: a statement that the Second District (i.e., the *Beaupre* panel) "agreed" with the failure to prove causation, and then quoting the sum-of-all-these-findings-fell-short passage from *Beaupre* (which we have also mostly quoted above). (*Beaupre, supra,* 13 Cal.App.3d at p. 407.)

Then came the final substantive paragraph of the opinion, which simply restated the *Minder* court's conclusion that the plaintiffs, as respondents, had "as a matter of law, failed to meet their burden of showing that the probable cause of their illness was contaminated food eaten at [the] restaurant." (*Minder, supra,* 67 Cal.App.3d at p. 1011.)

### 5. *A Critique of the* Minder *Analysis*

The trial court read the *Minder* analysis as requiring a "heightened" level of proof of causation in food poisoning cases. To the degree that there is, indeed, support for such a view in the text of the case itself, we respectfully decline to follow it, for no less than five separate reasons:

#### a. *Minder*'s general departure from established rules of tort causation

The *Minder* court never expressly said that it thought that defendants in food poisoning cases deserved a break from ordinary rules of tort causation,

---

[8] Here is the passage: "In *Beaupre* v. *Nave,* 13 Cal.App.3d 402 . . . , plaintiffs alleged they had contracted infectious hepatitis because they were frequent patrons in defendants' restaurant. The trial court had found that ' "From time to time defendants did violate health and sanitary rules . . . the food, beverages, utensils, bathroom and floors of the restaurant were unclean . . . and were not reasonably fit for the purpose . . . intended." ' (*Id.,* at p. 407.) The trial court nevertheless decided plaintiffs had failed to prove causation. This court, after citing the above findings agreed and said at page 407: 'But the sum of all these findings falls short of the necessary finding that anything that the defendants did or failed to do *caused* any injury to the plaintiffs.' (Italics in original.)" (*Minder, supra,* 67 Cal.App.3d at p. 1010.)

but that thought permeated the court's analysis, and it was certainly picked up by the trial judge in our own case, who described *Minder* as enunciating a "heightened" standard of causation.

■ We cannot agree, however, with the strong implication in the *Minder* analysis that food poisoning cases are somehow unique in tort law. Ironically, the current version of Frumer and Friedman's treatise on products liability—the 1977 version of which seemed to have played a role in *Minder's* analysis—is plainly to the contrary. Food poisoning cases follow the same rules as other tort cases: "The basic elements of proof in a food poisoning case are essentially those of any personal injury action." (4 Frumer & Friedman, Products Liability (2008) § 48.06[1], p. 48-23 (rel. 109-8/2008) (4 Frumer & Friedman).)

The current Frumer and Friedman treatise, apparently like its 1977 version, also continues to list the sort of facts that can prove a food poisoning case, but the spin is significantly different than the one apparently described in the *Minder* opinion. The current treatise states that "The *ideal* factual situation in a food poisoning case" would have all of these four elements: simultaneous illness of a group of people who eat the same food at the same time, all "patients" manifesting classic food poisoning symptoms, prompt investigation of suspect food (like potato salad left out too long), and "microscopic examination" of that food, which might show, for example, a staph infection, and which would correlate with the same infection sustained by the plaintiff. (4 Frumer & Friedman, *supra*, § 48.06[2], p. 48-24, italics added.)

But the Frumer and Friedman treatise recognizes that this "ideal . . . situation" will not always present itself to a court, and thus notes that often the plaintiff will have "recovered to the point where recovery of the pathogenic bacteria is no longer possible" and, also the food may not be "available for bacteriological study," besides which, often doctors may decide that the illness is not serious enough to "warrant[] the expense of such an investigation." (4 Frumer & Friedman, *supra*, § 48.06[2], p. 48-24.) And thus the treatise recognizes that: "Food poisoning cases, just as any other personal injury cases, often depend upon expert testimony." (*Id.*, § 48.06[3], p. 48-25.)

### b. *Minder's* departure from established case law allowing use of reasonable inferences

While the *Minder* court never straight out declared that inferences are off-limits in food poisoning cases,[9] its treatment of the various scenarios and

---

[9] Twice, in the context of listing scenarios of what might or might not show causation of food poisoning, the court used the same phrase, "support an inference of probable cause." (*Minder, supra*, 67 Cal.App.3d at p. 1009.)

its discussion of sanitation violations suggest that the court did not think that reasonable inferences are available to prove a plaintiff's case in a food poisoning case. (Either that, or, its implication is that no inference is ever quite good enough to be reasonable.) To the degree that the *Minder* opinion does indeed suggest a no-inference rule (or, at least, a presumption against inferences different from other tort cases), it contradicted established precedent in existence at the time.

### i. *Dougherty v. Lee*

*Minder* did not consider *Dougherty v. Lee* (1946) 74 Cal.App.2d 132 [168 P.2d 54] (*Dougherty*). *Dougherty* was also a food poisoning case, except it didn't involve human beings. It involved hay fed to cows.

In *Dougherty*, a rancher bought a ton of baled Sudan hay from a hay seller. The next morning he opened two or three bales and fed it to his cows. He fed some of the same hay that evening. The next morning five cows were dead and three were sick; two of those died, the other recovered. A post mortem by a veterinarian determined that the dead cows had botulism. However, an analysis of the hay was "not so conclusive," though a sample of the hay produced " 'some organism that looked like botulina bacilla.' " (*Dougherty, supra*, 74 Cal.App.2d at pp. 133–134.)

The appellate court upheld an award for breach of warranty against the hay seller. In setting out its initial conclusions, the court used language—"There can be little doubt" and "It seems quite persuasive"—that showed reasonable inferences were obviously available to prove food poisoning. (*Dougherty, supra*, 74 Cal.App.2d at p. 134.)

█ Then later, *Dougherty* made the availability of reasonable inferences quite explicit, doing so in the context of a plaintiff's burden of proof. Basically, the court said that the same rules of inference and substantial evidence applied in the food poisoning case before it as would normally apply in other civil cases. The *Dougherty* court quoted a passage about the burden of proof from a Supreme Court case, *Barham v. Widing* (1930) 210 Cal. 206 [291 P. 173] (a case involving an alleged improper solution or unsterile hypodermic needle used in treating an infected jaw), the punch line of which was a reiteration of the basic substantial evidence rule. Quoting from page 215 of the *Barham v. Widing* case, the *Dougherty* court said: " 'It is not necessary *in the trial of civil cases* that the circumstances shall establish the negligence of the defendant as the proximate cause of injury with such absolute certainty *as to exclude every other conclusion. It is sufficient if there is substantial evidence upon which to reasonably support*

*the judgment. (Ley* v. *Bishopp* [(1928)] 88 Cal.App. 313, 316 [263 P. 369].)' " (*Dougherty, supra*, 74 Cal.App.2d at p. 136, italics added.)

Next, *Dougherty* stated that the foregoing rule, from normal "civil cases" should apply to food poisoning cases: "Suits for damages resulting from partaking of poisoned food, whether they are based on negligence or upon a breach of implied warranty, are closely allied, and we assume the foregoing rule would apply to both classes of cases." (*Dougherty, supra*, 74 Cal.App.2d at pp. 136–137.)

Then the *Dougherty* court put its explicit imprimatur on the use of inferences in food poisoning cases: "Where *the evidence is susceptible of a reasonable inference that death or illness resulted from the eating of contaminated food, a prima facie case of negligence or of a breach of implied warranty of the fitness of the food, has been established, and it is erroneous for the court to direct a verdict for the defendant*. Under such circumstances a judgment for the plaintiff on that issue should not be disturbed on appeal." (*Dougherty, supra*, 74 Cal.App.2d at p. 137, italics added.)

### ii. *Grinnell v. Pfizer*

A vaccination case, also decided prior to *Minder*, and also clearly approving of the use of reasonable inferences to prove causation, is *Grinnell v. Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424 [79 Cal.Rptr. 369] (*Grinnell*). There, the two plaintiffs came down with polio after ingesting the Type I Sabin oral polio vaccine. In affirming large judgments for both plaintiffs on both a strict liability and breach of warranty theories, the *Grinnell* court stated that certain facts "entitled" the jury "to reasonably infer that the material issued by defendant was not accurate when it excluded all possible contraindications."[10] (*Grinnell, supra*, 274 Cal.App.2d at p. 441.) Moreover, said the court, since the jury was "entitled . . . to infer that the vaccine was defective and caused plaintiffs to contract polio, the jury was also entitled to conclude that the vaccine was not of the quality represented by defendant," ergo defendant breached its express warranty. (*Id.* at pp. 441–442.)

---

[10] Those facts were: (1) The Surgeon General had issued some information "indicating a risk of vaccine-induced polio to adults" and studies beginning in 1961 showed "a risk to those over 30 years of age"; (2) reports "that attenuated strains of polio virus were genetically unstable"; and (3) there had been several cases "classified as compatible with vaccine-induced polio" after "ingestion of oral polio vaccine." (*Grinnell, supra*, 274 Cal.App.2d at p. 441.)

c. *Minder*'s preference for a rule requiring exclusion of all possible alternative causes also departed from case law

Another rule that the *Minder* opinion never actually articulated, but which may arguably be mined from its analysis is a requirement that the plaintiff rule out all other causes of the illness. The argument for an "all alternatives must be ruled out" approach is also pressed by Salt Creek directly in the case before us. Salt Creek asserts that California law "requires proof excluding other causes."

We have already quoted the plain language from the *Dougherty* decision that shows that exclusion of alternatives is *not* the rule. (But we'll quote it again: " 'It is not necessary in the trial of civil cases that the circumstances shall establish the negligence of the defendant as the proximate cause of injury with such absolute certainty as to exclude every other conclusion.' " (*Dougherty, supra,* 74 Cal.App.2d at p. 136, quoting *Ley v. Bishopp, supra,* 88 Cal.App. at p. 316.)) We need only add that the rule-out-all-other-possible-causes rule is contrary to what our Supreme Court would later say in *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041 [1 Cal.Rptr.2d 913, 819 P.2d 872] (*Mitchell*), as we are about to show.

d. *Minder*'s variance from current California tort law regarding the standard of causation

We now come to that problematic phrase, "probable cause," that the *Minder* court treated, without authority,[11] as the talisman for what the plaintiffs had to prove in that case. If a law student had only the *Minder* case, he or she would likely assume that the causation element in California tort and warranty law was "probable cause."

---

[11] To be sure, the words "probable cause" had appeared as part of a quotation in *Dougherty* from an earlier Massachusetts opinion, *Monahan v. Economy Grocery Stores Corp,* (1933) 282 Mass. 548, 550 [185 N.E. 34] ("The plaintiff was not bound to exclude every other possible cause for his illness, but he was required to show that the probable cause was the unwholesomeness of the corn."). But the *Dougherty* court's point in using the quotation was to support the idea that the plaintiff did *not* have to exclude all other causes. Hence, the quotation was preceded, in *Dougherty,* by (1) a sentence recognizing that the plaintiff had the burden of proof ("Of course, the burden was on the plaintiff to show by a preponderance of the evidence that the hay which he had purchased from the defendant contained poison which killed the cows.") (*Dougherty, supra,* 74 Cal.App.2d at p. 135) followed by (2) a contrasting sentence rejecting the idea that the plaintiff had to exclude all alternative causes ("But it was not necessary for the plaintiff to furnish evidence which absolutely precluded the possibility of the cattle procuring some other poisonous food."). (*Ibid.*) Having made its point rejecting the idea that plaintiff had to "preclude[] the possibility" (*ibid.*) of alternative sources of poisoning, the *Dougherty* court supported its rejection with a passage from the *Monahan* decision, which included the words, "The plaintiff was not bound to exclude every other possible cause . . . ." (*Ibid.*) The *Monahan* court's use of the phrase "probable cause" was not the point of the passage. (See *Dougherty, supra,* 74 Cal.App.2d at p. 135.) And, for its part, the *Minder* court wisely did not cite *Dougherty* decision for a heightened "probable cause" standard because, ironically and in context, *Dougherty*'s use of a quote using the phrase was actually contrary to *Minder*'s apparent preference for a must-exclude-all-other-causes rule.

"Probable cause" is an important phrase in criminal law, and, of course, the lack of it in a previous lawsuit is an *element* of a civil tort cause of action for malicious prosecution. Ironically enough, in both the criminal and malicious prosecution contexts courts have tended to define the phrase fairly leniently. Thus in the criminal context, probable cause has been defined as "an ' "honest and strong suspicion" ' " (*People v. Perrusquia* (2007) 150 Cal.App.4th 228, 236 [58 Cal.Rptr.3d 485] (dis. opn. of Bedsworth, J.)) or " ' "a reasonable ground for belief of guilt" ' " (*Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1044 [55 Cal.Rptr.3d 158]). In the civil malicious prosecution context it has been defined with similar leniency, as whether "any reasonable attorney would have thought the claim tenable . . . ." (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 886 [254 Cal.Rptr. 336, 765 P.2d 498] (*Sheldon Appel*).)

Which is all very curious, because one cannot read the *Minder* opinion as a whole without getting the distinct impression that what it meant by "probable cause" was a far cry from honest suspicion, reasonable ground, or reasonable tenability. Clearly, *Minder* had something more "heightened" in mind, something that, for example, would be impervious to such evidence as a treating physician's opinion or conclusions that might readily be drawn from the fact of the sanitation violations.[12]

*Minder*'s "probable cause" language was at the very least dubious even at the time. (See *Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 127 [104 Cal.Rptr. 433, 501 P.2d 1153] [impliedly endorsing a plaintiff's "substantial factor" causation analysis in the context of strict products liability case].) But it is most certainly inconsistent with the law of causation as it stands today, in the light of the *Mitchell* case.

*Mitchell* was the case that disapproved an old jury instruction (BAJI No. 3.75) because it used the phrase "proximate cause," finding the phrase confusing, and endorsed a rival jury instruction (BAJI No. 3.76), which asked " 'whether the defendant's conduct was a *substantial factor* in bringing about the injury.' " (*Mitchell, supra,* 54 Cal.3d at p. 1049, italics added.) And, indeed, in the case before us, the jury was given (and correctly so in light of the *Mitchell* case) a substantial factor instruction, with "substantial factor" being defined as a "factor that a reasonable person would consider to have contributed to the harm." In fact, that instruction told the jury, "It [the substantial factor] does not have to be the *only* cause of the harm." (Italics added.) Whatever else, "substantial factor" does not equal "exclusive factor."

---

[12] Here's a law school hypothetical: Suppose the *Minder* court had used the phrase "probable cause" the way *Sheldon Appel* would later define it? Would the result in *Minder* be any different? Our answer: It should have been. Under the *Sheldon Appel* standard surely a treating physician's opinion would make a reasonable attorney believe in at least the reasonable tenability of a food poisoning claim.

### e. *Minder*'s miscitation of the *Beaupre* decision

Particularly relevant in the case before us is the question of what inferences are reasonable from sanitation violations in a restaurant food poisoning case. As we have noted, there was no evidence recounted in the *Minder* decision linking Shigella Flexneri to the *kind* of sanitation violations found at the Cielito Lindo Restaurant. Thus the court's declaration that "These [meaning the sanitation violations recounted pages prior] conditions, absent further evidence, could not establish probable cause" might have been accurate at the time. (*Minder, supra,* 67 Cal.App.3d at p. 1010.) As noted above, though, *Minder* did not operate in a "substantial factor" world. It is thus interesting to wonder whether the *Minder* court could have written that sentence post-*Mitchell.*

But in any event the *Minder* court's treatment of the earlier *Beaupre* decision was certainly incorrect at the time. Plainly said: You cannot cite a case that simply affirms a defense judgment because there was substantial evidence for the *trier of fact* to find that restaurant food did not cause food poisoning, *despite* health violations, for the legal proposition that health violations cannot support a restaurant food poisoning verdict as a matter of law. That is the sort of misreading of a case that usually gets a first semester law student a bad grade on a legal writing assignment. We will charitably assume that the *Minder* court was simply having a bad day.

### B. The Case Before Us

### 1. *The Inference Here Was Reasonable*

In the case before us, unlike *Minder*, there was expert testimony expressly making the link between the particular kind of food poisoning involved (campylobacter) and the particular unsanitary conditions found at the restaurant—cross-contamination from raw chicken. An expert for Sarti, Dr. Andrew Kassinove, testified that anything that might have touched something that touched raw chicken would be cross-contaminated. Particularly given the lack of proper sterilization in the dishwasher and the waiter's constant use of an unsterilized wipe-down rag, a reasonable jury could infer either that a rag used to wipe down a raw chicken board was used to wipe down a vegetable or tuna board, or, alternatively, that a drop or two of raw chicken juice may have leaked onto some of the vegetables stored beneath it. As Dr. Kassinove testified: "Any preparation in this case—this case dealt with raw cucumbers, wasabi, ginger, all those in addition to Ahi tuna which were uncooked, and vegetables that easily could have been prepared on a surface that had cross-contamination."

We should add that Dr. Kassinove also testified as to any necessary implications from Sarti's companion's *lack* of illness. Dr. Kassinove said that it was "very common for people to eat at the same restaurant or eat the same meal and only one person get sick. That one person had the misfortune or the metabolism or the bad luck that their body was susceptible to it at that time. . . . [¶] . . . Maybe two people even could be contaminated who ate from the same dish, but it's much more likely one person would get sick. Also, that one person might get sicker than the other two people who ate the contaminated piece of chicken. It's very common for one to get really sick, the other one to get a little stomach upset or some mild symptoms."

The expert testimony in this case linking the particular kind of food poisoning experienced by plaintiff to the particular kind of health violation attributable to defendant is what distinguishes this case from *Minder*.

It also distinguishes this case from *Reese v. Smith* (1937) 9 Cal.2d 324 [70 P.2d 933] (*Reese*), where there was a positive exoneration of the defendant's food by the health department because a sample of the food was available for examination the next day after the plaintiff took sick.

In *Reese*, a seamstress stopped at a meat market about 5:00 o'clock, where she purchased a pound of linked sausages. She went home and, about a half an hour later, made herself a fried sausage sandwich, using only a portion of the sausage. The remainder went back to the "ice box." (This was the 1930's, remember.) She became ill "as she finished" eating the sandwich; within a few minutes neighbors offered their assistance and the police were summoned. One of the officers examined what was left of the sausages with his flashlight, and noticed several maggots on the open end of the sausage. Also, a neighbor testified that he saw two maggots between two of the linked sausages. The plaintiff's physician testified that the plaintiff had suffered "botulism" and in his opinion it was caused from eating the sausages. (*Reese, supra*, 9 Cal.2d at pp. 325–326.)

The trial court, sitting without a jury, did the intuitive thing and awarded plaintiff a damage award against the meat market. The Court of Appeal reversed, and that opinion was later adopted verbatim by the Supreme Court (hence almost all the opinion is one long quote from the appellate court's opinion; all our quotations from the opinion thus omit the initial quotation marks showing the high court was quoting from the lower court).

Why should the Supreme Court reverse a judgment for the plaintiff when maggots had been found on meat the plaintiff had consumed almost immediately before? The answer lies in a fact in *Reese* that is not common in food poisoning cases: A sample of the food consumed could be scientifically tested contemporaneously with the illness.

It turned out that the very next day after the seamstress took ill, inspectors from the city health department visited the plaintiff's home and made an examination of the remaining sausages, including a *microscopic* examination. Those inspectors testified that the remainder of the sausages appeared fresh and wholesome and maggot-free when they examined it, and, more importantly, the microscopic examination showed no " 'organism of the food poisoning groups' " to be present. (*Reese, supra*, 9 Cal.2d at p. 327.)

Now, the *Reese* court did acknowledge that no examination was made specifically for botulism, and that was because—and the *Reese* court emphasized the expert testimony in this regard was uncontroverted—botulism only flourishes in environments without oxygen. (*Reese, supra*, 9 Cal.2d at p. 327.) Moreover (again, an uncontroverted point in the *Reese* case) botulism takes at least "several hours" to manifest itself after the "contaminated food is eaten." (*Ibid.*) The court noted, in contrast, that the "only expert evidence offered by [the] plaintiff" was that of her physician, who diagnosed the case as one of botulism. (*Ibid.*)

The *Reese* court then reasoned that maggots themselves are "not poisonous," and not necessarily confined to rotting food, and described maggots as "but the larvae of insects, most commonly that of the housefly." (*Reese, supra*, 9 Cal.2d at p. 328.) In fact, the court went on to say that maggots "are used in modern surgery for the treatment of open wounds." (*Ibid.*) (We would note that antibiotics were not in general use in 1937.) Since, "The only credible evidence as to the condition of the meat was that it was pure and wholesome when chemically analyzed on the day following the sale," the *Reese* court concluded that the treating physician's inference that his patient's botulism was the result of eating the sausages was not reasonable. (*Id.* at p. 329.)

A close reading of the *Reese* case shows that its somewhat counterintuitive result is "explainable" on the ground that the evidence that the sausages were "wholesome" was so strong as to be preclusive of any contrary possibility, much less inference. After all, it is the rare food poisoning case where city health inspectors get to make a microscopic examination of a portion of the suspect food the very next day (and we note, presumably the passage of time would only increase the probability of maggots) and rule out any organism from "food poisoning groups." And indeed, the later *Dougherty* opinion would distinguish *Reese* on that very basis. (See *Dougherty, supra*, 74 Cal.App.2d at p. 138.)

On top of that, the treating physician's opinion that his patient was ill with botulism, when examined in the light of the uncontroverted evidence that botulism could "only flourish where there is no oxygen," that botulism "does not manifest itself for several hours after contaminated food is eaten" and, of

course, that the plaintiff became ill almost immediately upon consuming the sausage sandwiches, completely undercut the plaintiff's case. (*Reese, supra*, 9 Cal.2d at p. 327.)

Perhaps not wanting to be associated with maggoty sausages, Salt Creek has not cited or relied on the *Reese* decision in any way in its briefing. Though on the surface *Reese* seems a strong case for the defense in food poisoning cases, on reflection it actually underscores our "strict" reading of *Minder*. That is, in *Reese*, there was no evidence (at least presented to the 1937 court) that linked the plaintiff's particular illness, which was botulism, to any particular health hazard attributable to the defendant. For the *Reese* court, the timing of the illness, the relatively oxygen rich environment of the icebox, and the microscopic examination ruled out any attribution of the plaintiff's *botulism* to the sausage that had maggots on it. And, we should add, the *Reese* court did not suggest that inferences were off-limits, as a matter of law, to prove a food poisoning case. It merely held that under the particular evidence before it, the inference of causation was not reasonable.

### 2. *Salt Creek's Rule-out-all-alternatives Argument: In Its Direct Form*

Salt Creek asserts that Sarti was required, as a matter of law, to exclude all "possibilities" other than the meal she had at the restaurant. As we have already shown in our criticisms of *Minder*, that point is untenable. *Mitchell* plainly demonstrated that California law on causation is "substantial factor." And, as the prior *Dougherty* opinion expressly stated, a plaintiff need not " 'exclude every other conclusion' " than the defendant's negligence. (*Dougherty, supra*, 74 Cal.App.2d at p. 136.)

At this point, we should confront the semantic danger in the word "possibility." The word must necessarily connote something more than bare conceivability or plausibility, otherwise it would swallow up the universe. For example, in a food poisoning case, how could the plaintiff disprove that she *didn't* pick up some nasty bacteria (here, campylobacter) because she touched a doorknob that had been previously touched by someone who had been handling raw chicken or who had changed a diaper, and hadn't washed his or her hands? Well, yes, one might reason, it is conceivable that that might have happened. It is ludicrous, though, to suggest that such bare conceivability must, *as a matter of law*, defeat a food poisoning claim.

The relevant question is this one: Was there any *substantial evidence* that someone who had just handled raw chicken (or changed a diaper or whatever) and who hadn't washed his or her hands, touched something that the plaintiff soon touched, and then the plaintiff, say, ate a hamburger or a

sandwich without washing her hands, after which she became sick within a timeframe consistent with the illness that she, indeed, contracted? In the Georgia *Payton* case, which served as the inspiration for *Minder*'s "explainable on [other] grounds" language, there was certainly substantial evidence of such an alternative "explanation" for the disease (the virus going around town at the time). (*Minder, supra,* 67 Cal.App.3d at p. 1009.)

Given the facts of the case before us, we are spared the tough problem of whether the existence of an alternative "explanation" supported by substantial evidence competing with the finding the jury actually chose might somehow defeat, as a matter of law, the jury's finding of food poisoning from the restaurant meal. (We don't think so, given the *Mitchell* case, because substantial factor does not have to be the "exclusive factor," but that precise problem can await another day.) Salt Creek has cited no substantial evidence *requiring a finding* that Sarti picked up the campylobacter from handling a leaky package of chicken while working at a checkstand, or handling a cat, or somehow being exposed to a baby in the house, or eating in the lunchroom with the employees from the meat department.

One must remember, it is the winning party after a jury trial, not the losing party, who gets the benefit of reasonable inferences from the evidence. Under classic rules of appellate review, we are required to accept the inference, if reasonable, that Salt Creek got sloppy with its wipe-down rags over the inference that Sarti ran a leaky bag of chicken through a checkout scanner and then didn't wash her hands before touching some food she ate.[13]

### 3. *Salt Creek's Rule-out-all-alternatives Argument: Its "Gotcha" Form*

#### (*Based on Acquiescence to a Bad Jury Instruction*)

A variation on Salt Creek's exclusion-of-all-else theory is based on Sarti's failure to challenge all the language in the "substantial factor" jury instruction, which, ironically as Salt Creek now reads it on appeal it believes

---

[13] Here's another law school hypothetical: Suppose the trial judge had *granted* a new trial motion based on insufficient evidence (see Code Civ. Proc., § 657) because *he* drew the inference that Sarti was exposed to campylobacter from a bag of leaky chicken (or by shaking hands in the lunchroom with an employee from the meat department or some similar encounter with someone who had just changed diapers without washing, or whatever). Would *that* decision be upheld on appeal under the abuse of discretion standard for the granting of a new trial because, on review from the granting of a new trial motion, we would be required to draw all reasonable inferences in favor of the trial court's decision? That is, would an inference that Sarti got the campylobacter from a bag of leaky chicken be strong enough to sustain the new trial grant? Our answer: We'll leave that one for another day.

*required* the jury to find for the defense unless Sarti ruled out all other causes. Deconstructed, Salt Creek's argument is: Even if a rule-out-all-possibilities rule is not the law, Sarti's lawyers effectively agreed to that faulty rule in a jury instruction, and therefore she *must* lose because of *their* acquiescence to an instruction even if it does not accurately reflect the law.

The jury instruction consisted of two paragraphs, which we now quote in full: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] In food poisoning cases, the plaintiff must prove that the food was unwholesome or unfit and caused her illness. If you find that her illness is explanable [*sic*] on grounds other than unwholesomeness of the food, you must determine by a preponderance of the evidence that plaintiff has excluded such other causes."

We recognize that this is not the most felicitous jury instruction around. On the one hand, the phrase from the last sentence, "explanable [*sic*] on grounds other than unwholesomeness of the food," was obviously lifted verbatim from the passage in the *Minder* case about the Georgia potato salad decision. (See *Minder, supra*, 67 Cal.App.3d at p. 1009.)

On the other hand, the first paragraph, which plainly says that food poisoning did not "have to be the only cause of the harm," is certainly an accurate statement of basic tort causation in light of *Mitchell*. Counsel for Sarti, of course, had no choice in acquiescing to the "explainable on grounds other" clause of the instruction, because—until our opinion in this case—no published appellate decision has had occasion to note that *Minder*'s 1977 approach to causation is inconsistent with current law as established in *Mitchell*. Thus, apropos our initial discussion of *Auto Equity Sales*, the trial court was bound to try to find some formulation that recognized both the *Mitchell* substantial factor approach and the (still technically viable at least to that point) "explainable on grounds other" language from *Minder*. The tension in the jury instruction is simply a reflection of *Minder*'s tension with *Mitchell*.[14]

In any event, for the same reasons outlined under the previous subheading in this opinion, Sarti's counsel's acquiescence in the (in our opinion, no longer valid in light of current law) "explainable on grounds other" language from *Minder* did *not* require the trial judge to grant the jnov motion (or

---

[14] Interestingly, a tension reflected in the very typeface of the written jury instruction as it appears in our record. The first paragraph, reflecting *Mitchell*, is double spaced. The second paragraph, reflecting *Minder*, is single spaced. It is as if the trial court literally cut and pasted the two competing jury instructions proposed by the two competing sides into one document.

require us to otherwise affirm that grant of jnov). As we have noted, and under classic rules of appellate review (inferences are not drawn in favor of the loser after a jury trial) there is no substantial evidence to transform the bare speculative possibilities of contraction of campylobacter via checkstand, baby diapers, a cat in the house or the lunchroom into a valid alternative explanation.

## C. The Cross-appeal

### 1. *The Consistency Issue*

The restaurant has taken a protective cross-appeal, based on the denial of a motion for new trial heard at the same time as its motion for jnov. Most of the cross-appeal is merely argument based on *Minder* by other means, i.e., contending that it was legal error to allow a verdict for plaintiff to stand.

We should mention, though, that it was certainly within the bounds of reason, i.e., within the proper exercise of the trial court's discretion, to deny the new trial motion at least on the contingency that the jnov motion was reversed on appeal. This is not a case (like *Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743 [79 Cal.Rptr.2d 248]) where the trial judge clearly thought that defendant should be the prevailing party, no matter what. The judge in this case made it clear on the record that he would have voted with the jury on liability, and the only reason he was granting the jnov was the *Minder* case. Thus his denial of a new trial (as an alternative result if the jnov were overturned) is logically consistent: The judge thought that there *was* substantial evidence to support the jury's verdict, and would not have overturned it except that he felt compelled to do so under the rule of stare decisis.

### 2. *The Jury Misconduct Issue*

Salt Creek raises, however, one issue that does not depend on the *Minder* case—jury misconduct. The motion for new trial was supported by four very brief and conclusory juror affidavits to the effect that the jurors determined not to follow the court's instructions. (Basically, the four jurors said that the jury "agreed" (that's the operative word in all four affidavits) to require Salt Creek to prove that its food didn't cause the food poisoning.)

The standard of review on a new trial motion alleging juror misconduct is abuse of discretion. (E.g., *People v. Williams* (1988) 45 Cal.3d 1268, 1318 [248 Cal.Rptr. 834, 756 P.2d 221].) There was none here. The trial judge noted the "anodyne" (literally, from the Greek, "no pain") quality of the four affidavits (one said that the jury "listened to all of the evidence presented and

carefully deliberated before deciding this case"—hardly the sort of thought that would support a finding of jury misconduct!), and said it looked as if the affidavits had been drafted merely to be "congenial" to defendant's evidence.

The absence of any supporting detail about the jurors having supposedly "agreed" to do something contrary to an instruction supports the reasonable inference that the affidavits were mere conclusions about the jurors' mental processes. Thus it was not unreasonable for the judge to deny the motion. (See *Ford v. Bennacka* (1990) 226 Cal.App.3d 330, 336 [276 Cal.Rptr. 513] [deliberative error based on misinterpretation of law not admissible].)

## III. DISPOSITION

The judgment notwithstanding the verdict is reversed. The case is remanded to the trial court to reinstate the original judgment. Appellant shall recover her costs on appeal.

Rylaarsdam, J., and Moore, J., concurred.

A petition for a rehearing was denied November 26, 2008, and the opinion modified to read as printed above. Respondent's petition for review by the Supreme Court was denied January 21, 2009, S168822. Kennard, J., was of the opinion that the petition should be granted.